GREENPEACE, INC. (U.S.A.), Paula Huckleberry, Greenpeace New Zealand, Inc., Stichting Marine Services aka Greenpeace Marine Division, Jon Castle, Philip Pupuka, Stephanie Mills, Derek Nicholls, Peter Schwarz, Alan Baker, and Matthew Whiting, Plaintiffs,

v.

The STATE OF FRANCE, a foreign state, Phillipe Euverte, Paul Ronciere, and Larry Doe, a U.S. individual unknown last name, serving in the French Foreign Legion, Defendants.

No. CV–95–6982 KMW (CTx).

United States District Court,
C.D. California.

Oct. 4, 1996.

---

Mark A. Serlin, Law Offices of Mark A. Serlin, Sacramento, CA, for Plaintiffs.

Jonathan D. Schiller, Robert C. Bell, Jr., Todd Thomas, Kaye, Scholer, Fierman, Hays & Handler, LLP, Washington, D.C., Pierce O'Donnell, Rex T. Reeves, Jr., O'Donnell, Reeves & Schaeffer, LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

WARDLAW, District Judge.

## I. BACKGROUND

This action concerns the arrests of certain employees and/or volunteers of Greenpeace, Inc. (USA) and its affiliated organizations (collectively, "Greenpeace") and the seizure of their vessels by the Republic of France arising from Greenpeace activities in protest of France's resumed nuclear testing in September 1995.[1]

On June 13, 1995, the Republic of France announced that, in anticipation of entering into a Comprehensive Nuclear Test Ban Treaty with the United States and other nations, it would conduct a final round of underground nuclear weapons testing in the area of French Polynesia, with testing to end no later than May 1996. Euverte Decl. ¶ 3; Bonnafont Decl.Ex. 1. The testing was to take place in a military exclusion zone surrounding the atolls of Mururoa and Fangataufa. Euverte Decl. ¶ 4. To ensure that underground testing would be conducted safely, the High Commissioner of French Polynesia, on June 23, 1995, issued Order No. 707 forbidding any entry or passage, including "innocent passage," for both French and foreign ships in the territorial sea. Euverte Decl. ¶ 5; Bonnafont Decl., Ex. 2.

---

1. Greenpeace USA is a United States non-profit organization incorporated in the state of California. Greenpeace New Zealand, Inc. and Stichting Marine Services aka Greenpeace Marine Division are non-profit organizations affiliated with Greenpeace. The individual plaintiffs, Paula Huckleberry ("Huckleberry"), Jon Castle ("Castle"), Philip Pupuka ("Pupuka"), Stephanie Mills ("Mills"), Derek Nicholls ("Nicholls"), Peter Schwarz ("Schwarz"), Alan Baker ("Baker"), and Matthew Whiting ("Whiting") are employees and/or volunteers for Greenpeace USA and/or one of its affiliated organizations. Complaint ¶¶ 1–11, 18. The defendants in this action are, in addition to France, individual defendants Phillipe Euverte, Paul Ronciere, and Larry Doe.

According to Defendants, based on prior efforts by environmental groups to protest nuclear weapons testing by France, as well as the announced intention of Greenpeace to protest the latest round of testing, French Naval authorities established routine patrols in the territorial sea near the test site. Euverte Decl. ¶¶ 6, 7. In July, August, and September 1995, the French Navy distributed a letter to all ships passing around the atolls of Mururoa and Fangataufa, informing them of the restrictions and noting that ships violating those restrictions would be subject to criminal prosecution under French law. Euverte Decl., Ex. A.

## A. Seizure of the *Rainbow Warrior II* and the *M/V Greenpeace.*

On September 1, 1995, French naval vessels allegedly observed a Dutch-flag vessel, the *Rainbow Warrior II,* in waters immediately adjacent to the French territorial sea. That ship purportedly launched five small boats known as zodiacs in the direction of Mururoa. Euverte Decl. ¶¶ 10–11. According to Defendants, the zodiacs then entered the French territorial sea in violation of Order No. 707, and they also entered the forbidden military exclusion zone. The *Rainbow Warrior II* itself then allegedly entered the French territorial sea in violation of Order No. 707. Euverte Decl. ¶ 11.

Pursuant to the instruction of judicial police officers who were on board French naval vessels, the French Navy took control of the zodiacs. Euverte Decl. ¶ 11; *see* Queneudec Decl. ¶¶ 11–13. In addition, French naval vessels allegedly approached the *Rainbow Warrior II* and issued a warning to its captain to cease the encroachment into the French territorial waters and the protected military zone. Euverte Decl. ¶ 12. After the captain refused to acknowledge or obey the warning, the French Navy took control of the *Rainbow Warrior II.* According to Defendants, the ship was only 6.2 miles from the atoll of Mururoa and well inside the French territorial sea when it was seized. Euverte Decl. ¶ 13; Bonnafont Decl.Ex. 3.

Also on September 1, 1995, French naval vessels observed a second Dutch-flag vessel, the *M/V Greenpeace,* in waters adjacent to the French territorial sea. Euverte Decl. ¶ 14. At just after 4:00 a.m., the *M/V Greenpeace* purportedly launched four zodiacs, and those crafts entered the French territorial sea in violation of Order No. 707. The *M/V Greenpeace* also purportedly launched a helicopter, apparently for the purpose of filming the activities of the *Rainbow Warrior II* and other Greenpeace boats. The helicopter allegedly overflew the airspace above the protected military zone, in violation of French law. Euverte Decl. ¶ 14.

As with the *Rainbow Warrior II,* the French Navy took immediate action to stop the violations of French territorial waters by craft launched from the *M/V Greenpeace.* According to Defendants, the French Navy, exercising its right of pursuit under international law, gave pursuit to the *M/V Greenpeace* and, after its captain refused to acknowledge or obey a warning, took control of that ship. The *M/V Greenpeace* purportedly was positioned some 12.6 miles from the coastal baseline of Mururoa at the time it was seized. Euverte Decl. ¶ 15; Bonnafont Decl., Ex. 3.

## B. Expulsion of Individual Plaintiffs Huckleberry, Schwarz, Mills, Pupuka, Nicholls and Castle.

On September 6, 1995, in the port of Hao, the *Rainbow Warrior II* and the *M/V Greenpeace* were impounded, inventoried, and sealed. Euverte Decl. ¶¶ 13, 16. On or about the same date, the High Commissioner for the Republic in French Polynesia issued orders of expulsion and deportation for various non-French crew members of the *Rainbow Warrior II* and the *M/V Greenpeace.* In particular, Huckleberry, the helicopter pilot; Schwarz, captain of the *M/V Greenpeace;* and *Rainbow Warrior II* crew members Mills, Pupuka and Nicholls were placed on board a French military flight to Paris. Bonnafont Decl., Ex. 5; Cambraye Decl. ¶ 2.[2] The pilots and crew on the September 6 military flight were composed exclusively of

**2.** Castle, captain of the *Rainbow Warrior II,* purportedly boarded a commercial flight out of

French Polynesia on September 8, 1995. Memorandum at 9, n. 10; Bonnafont Decl., Ex. 5.

French military personnel. Cambraye Decl. ¶¶ 2–8. During a 90 minute stopover in Los Angeles, Huckleberry, a U.S. citizen, was permitted to disembark after U.S. immigration officials gave her permission to do so. *Id.* According to Plaintiffs, other Greenpeace members attempted to disembark in Los Angeles with Huckleberry, but French military personnel blocked their access to the airplane door. Huckleberry Decl. ¶¶ 5–6; Nicholls Decl. ¶¶ 6–8; Mills Decl. ¶¶ 5–6. Defendants maintain that none of the individual plaintiffs objected or complained about any aspect of the military flight. Cambraye Decl. ¶¶ 2–8. Ultimately, Schwarz, Mills, Pupuka and Nicholls were flown to their destination in Europe. *Id.*

### C. Arrest and Expulsion of Individual Plaintiffs Whiting and Baker.

On September 4 and 5, 1995, Defendants maintain that French naval patrols discovered that two British citizens, individual plaintiffs Whiting and Baker, had penetrated the protected military zone in small boats. Memorandum at 9. Whiting was arrested on September 4 on the atoll of Mururoa, and Baker was arrested the next day when he was found in a canoe in the waters of the military zone. The High Commissioner issued expulsion orders for Whiting and Baker on September 8, 1995. Bonnafont Decl., Ex. 5. According to Defendants, on September 9, 1995, the High Commissioner purchased airline tickets for Whiting and Baker and they were placed on board a commercial Air France flight unaccompanied by any police, military officers, or any other officials or employees of the French government. Baker and Whiting were flown to their final destination in London, with a stopover in Los Angeles. Memorandum at 9; Complaint ¶ 22.

### D. Seizure of the *Manutea.*

On October 1, 1995, French naval authorities observed a U.S.-flag vessel known as the *Manutea* in waters adjacent to the French territorial sea. Euverte Decl. ¶ 17. Greenpeace had chartered the *Manutea* from a U.S. company for use "in the general area of Mururoa Atoll." *See* Crowley Decl. in Support of Partial Summary Judgment, Ex. A.

At around 3:00 a.m. on October 1, the *Manutea* purportedly launched a small dugout canoe, known as a pirogue, in the direction of Mururoa and into the French territorial sea in violation of Order No. 707. Euverte Decl. ¶ 17. At around 3:30 a.m., the French Navy intercepted the pirogue and its three passengers. Euverte Decl. ¶ 18. The passengers, all Tahitian nationals, have admitted that they were recruited by Greenpeace to participate in a protest of French weapons testing. These individuals have further admitted that they were well-treated by the French Navy when and after they were intercepted. *See* Declarations of Faana-Papa, Tahitini, and Rooararii.

Because the pirogue had been launched from the *Manutea,* the French Navy gave pursuit to that ship, and took control of it at approximately 6:00 a.m., at a position 13 miles from the coastal baseline of Mururoa. Euverte Decl. ¶ 18; Bonnafont Decl. Ex. 6. The ship was diverted to the port of Mururoa, where it was impounded, inventoried and sealed. Euverte Decl. ¶ 19.

### E. The Filing of the Complaint and Procedural History in this Action.

On October 17, 1995, Plaintiffs filed a Complaint for Personal Injury against the State of France and individual defendants Phillipe Euverte ("Euverte"), Paul Ronciere ("Ronciere"), and Larry Doe, "a U.S. individual unknown last name, serving in the French Foreign Legion" ("Doe").[3] The Complaint sets forth causes of action for (1) kidnapping; (2) assault and battery; (3) intentional infliction of emotional distress; (4) conversion; (5) claim and delivery; (6) intentional interference with civil rights; (7) intentional interference with economic and non-economic relations; and (8) *prima facie* tort.

---

**3.** According to the Complaint, Euverte was the French military commander responsible for operations of the French military in the South Pacific Ocean; Ronciere is the High Commissioner of French Polynesia; Doe is a U.S. citizen serving in the French Foreign Legion operating in the South Pacific Ocean. Complaint ¶¶ 13–15.

Plaintiffs allege that on or about September 1, 1995, they were "exercising commonly and internationally recognized rights of peaceful assembly, free expression, and protest and navigation within international and territorial waters in the South Pacific Ocean with respect to proposed underground nuclear weapons testing intended to be carried out by" France. Complaint ¶ 19.

Plaintiffs further allege that, without justification, defendants and/or their agents boarded their vessels, forcibly removed Plaintiffs against their will to Hao and various points in the South Pacific, maliciously destroyed communications and other equipment on board such vessels, and "forcibly and without cause and without providing any compensation therefor removed and converted to their own use various personal property" belonging to the crew members of the vessels. Complaint ¶ 20.

Thereafter, the individual plaintiffs were allegedly "forcibly and involuntarily separated and held by defendants against their will and in inhuman and degrading conditions for several days." Complaint ¶ 21. On or about September 6, 1995, various individual plaintiffs were allegedly "forcibly placed on French aircraft whereupon they were flown to Los Angeles, California," and "were forcibly, involuntarily, and illegally detained by France in Los Angeles for a significant amount of time." Complaint ¶ 22. Despite their demands to be released in Los Angeles, only Huckleberry was allowed to leave, and the other plaintiffs were taken to Paris, France, where they were released without being charged. Complaint ¶ 23.

With respect to Baker and Whiting, Plaintiffs allege that after the Air France plane landed in Los Angeles, "they were physically struck and prohibited by means of involuntary bodily contact from de-planing by one or more agents and/or employees of France and/or Air France." Complaint ¶ 24. Whiting purportedly sustained serious bodily injury as a result of such beating. *Id.*

Plaintiffs further state that, on or about October 1, 1995, French military personnel seized the U.S.-flagged *S/V Manutea* and its personnel. Complaint ¶ 25.

On November 20, 1995, Plaintiffs filed a motion for partial summary judgment as to their fifth cause of action for claim and delivery. This motion was withdrawn on March 21, 1996, after France released *Rainbow Warrior II, M/V Greenpeace,* and the *Manutea* and returned these vessels to their owners. *See* Notification of Status of Vessel, filed March 19, 1996.

On December 28, 1995, Defendants filed a motion to dismiss Plaintiffs' Complaint for improper service. Following a February 27, 1996 hearing,[4] Plaintiffs served the Complaint on the Republic of France on April 3, 1996, but, according to Defendants, neither served nor attempted to serve the individual defendants. Memorandum at 11–12; Defendants' Post–Hearing Memorandum at 9. Although Plaintiffs' counsel has represented to the Court that "[the individual defendants] have been served," Transcript of July 29, 1996 hearing ("Transcript") at 3, Plaintiffs have failed to establish that such service was effectuated in accordance with the requirements of the Hague Convention.[5]

On June 3, 1996, Defendants moved to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1). A hearing on the motion was held before this Court on July 29, 1996. At the hearing, the Court indicated that it

---

**4.** According to the Court's minute order, dated February 27, 1996, Defendants' motion to dismiss was denied and Plaintiffs were granted 30 days to perfect service on the Republic of France.

**5.** In their respective papers, and during the July 29, 1996 hearing, the parties disagreed as to whether the individual defendants had been properly served with the summons and complaint. Therefore, on September 11, 1996, the Court issued an order to show cause ("OSC") in writing why this action should not be dismissed as against the individual defendants for failure to effect service in accordance with Fed.R.Civ.P. 4. In their response to the OSC, Plaintiffs fail to demonstrate that service has been made "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents," or by any other authorized means. *See* Fed.R.Civ.P. 4(f); Plaintiffs' Response to OSC at 1–2; Defendants' Response to Plaintiffs' Response to OSC at 1–2.

was "inclined to dismiss the lawsuit against France" because Plaintiffs had not presented "sufficient evidence to meet any of the exceptions to [sovereign immunity in] the Foreign Sovereign Immunities Act." Transcript at 7. Counsel for Plaintiffs failed to proffer evidence which would support the Court's exercise of jurisdiction in this case, and declined the Court's invitation to present testimony at the hearing. Transcript at 19. However, counsel for Plaintiffs indicated that they possessed and were willing to produce evidence of jurisdictional facts:

> [S]ubsequent to the filing of our opposition brief I have been able to obtain affidavits from various of the plaintiffs. I did not feel that it was appropriate to file those after our opposition was due. These people are spread around the globe and are difficult to get a hold of. I have those declarations. I am in a position to file them, but as I said, I felt it improper to file them after our opposition was due.

Transcript at 18. Based upon this and other representations made by Plaintiffs' counsel during the hearing, the Court took Defendants' motion to dismiss under submission and allowed Plaintiffs an opportunity to submit additional briefing and affidavits to establish sufficient facts to support either the Court's exercise of jurisdiction over this case or an order permitting Plaintiffs to conduct discovery toward that end. On August 2, 1996, Plaintiffs filed their supplemental brief and declarations, and, on August 9, 1996, Defendants filed their supplemental response. The motion to dismiss for lack of subject matter jurisdiction is now before the Court.

## II. DISCUSSION

### A. Subject Matter Jurisdiction Under the Foreign Sovereign Immunities Act.

■ The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602, *et seq.* ("FSIA"), provides that, "[s]ubject to existing international agreements to which the United States is a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this

chapter." 28 U.S.C. § 1604. The FSIA "sets forth the general rule that foreign states are immune from the jurisdiction of both federal and state courts in the United States, subject to certain exceptions." *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 706 (9th Cir.1992), *cert. denied,* 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993). A federal court lacks subject matter jurisdiction over a claim against a foreign state unless the claim falls within an exception to immunity under the FSIA. *Id.; see also Argentine v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (FSIA is "sole basis for obtaining jurisdiction over a foreign state in federal court"); *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493–94, 103 S.Ct. 1962, 1971–72, 76 L.Ed.2d 81 (1983) (court must dismiss any case in which it cannot "satisfy itself that one of the exceptions applies").

■ Moreover, "the presumption under the FSIA is that actions taken by foreign states or their instrumentalities are sovereign acts and thus protected from the exercise of [the court's] jurisdiction, unless one of the exceptions applies." *West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 824 (9th Cir. 1987), *cert. denied,* 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987); *Joseph v. Office of Consulate General of Nigeria,* 830 F.2d 1018, 1021 (9th Cir.1987), *cert. denied,* 485 U.S. 905, 108 S.Ct. 1077, 99 L.Ed.2d 236 (1988). Thus, once a defendant establishes that it is a sovereign state and that the plaintiff's claim arises out of a public act, the plaintiff "has the burden of going forward with the evidence by offering proof that one of the FSIA exemptions applies." *Siderman,* 965 F.2d at 708, n. 9. After the plaintiff has presented this evidence, the defendant must prove its entitlement to immunity by a preponderance of the evidence. *Id.*

In this case, it is undisputed that the Republic of France is a foreign sovereign and that the acts about which Plaintiffs complain were public acts. This establishes a presumption that France is protected by immunity. Plaintiffs assert that the FSIA exceptions set forth in sections 1605(a)(1), (3), and (5) apply to their claims and support this

Court's exercise of jurisdiction. However, in order to defeat the instant motion, Plaintiffs must come forward with sufficient evidence to support the applicability of these exceptions. *See Siderman*, 965 F.2d at 708, n. 9.[6]

### 1. Waiver of Sovereign Immunity under Section 1605(a)(1).

■ Section 1605(a)(1) of the FSIA provides for jurisdiction if "the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). The waiver exception to sovereign immunity is " 'narrowly construed' " and will be found only if it can be said that the foreign sovereign by its agreement or conduct " 'contemplates adjudication of a dispute by the United States courts.' " *Siderman*, 965 F.2d at 720–21, *quoting Joseph v. Office of Consulate General of Nigeria, supra*, 830 F.2d at 1022, 1023.

■ Plaintiffs maintain that, with respect to their fifth cause of action for claim and delivery, France impliedly waived its foreign sovereign immunity. According to Plaintiffs, France had a treaty obligation not to interfere with the freedom of vessels sailing on the high seas. Opposition at 22, *citing Convention on the High Seas*, Apr. 29, 1958, art. 2; 450 U.N.T.S. 11, 82, 84; *United Nations Convention on the Law of the Sea*, Dec. 10, 1982, arts. 87, 89, 21 I.L.M. 1261, 1286, 1287 (1982); *Restatement (Third)* § 521. By letter dated September 3, 1995, defendant Vice Admiral Euverte specifically represented to Greenpeace that France would abide by its treaty obligations.[7] Because under applicable treaties ships sailing on the high seas are subject to the exclusive jurisdiction of the flag under which they sail, Plaintiffs conclude that France subjected itself to the jurisdiction of the United States courts by seizing

the U.S. flagged *Manutea*. Opposition at 22–23.

Contrary to their assertions, the treaties to which Plaintiffs refer do not constitute an implied waiver of sovereign immunity. As the Department of State explained in commentary on the *United Nations Convention on the Law of the Sea* sent to President Clinton in September 1994, "[t]he Convention protects and strengthens the key principle of sovereign immunity" for "warships and other government ships operated for non-commercial purposes." Memorandum, Ex. C. Articles 95 and 96 of the *Convention* specifically affirm that "warships" and "ships owned by a State and used only on government non-commercial service" shall, on the high seas, have complete immunity from the jurisdiction of any State other than the flag State. *See id.* Nothing contained in the treaties suggests that the signatories have agreed to subject themselves to the jurisdiction of the United States courts. *See Amerada Hess*, 488 U.S. at 442–43, 109 S.Ct. at 692–93 (rejecting contention that a foreign state can waive its immunity under section 1605(a)(1) by signing an international agreement, specifically there the 1958 *Geneva Convention on the High Seas*, where agreement contains no mention of a waiver of immunity to suit in United States courts or even the availability of a cause of action in the United States).

Nor does Vice Admiral Euverte's letter suggest an implied waiver of sovereign immunity. On the contrary, the letter expressly warned that under Order No. 707 the right of passage in the territorial sea had been suspended, and that any infringement of the restrictions imposed by Order No. 707 would be subject to criminal prosecution under French law. Euverte Decl., Ex. A.

---

6. The Court rejects Plaintiffs' contention that the jurisdictional and substantive issues are intertwined in this case. Opposition at 6. Here, the jurisdictional issues are separable from the merits of Plaintiffs' claims. Therefore, the jurisdictional issue must be resolved as a "threshold matter" based upon the facts presented. *See Intercontinental Dictionary Series v. De Gruyter*, 822 F.Supp. 662, 671 (C.D.Cal.1993); *Siderman*, 965 F.2d at 706.

7. In the September 3, 1995, letter, Vice Admiral Euverte stated, "[n]aturally, I do not share your point of view, although you should know that I respect it. As long as your ship will remain on the high seas, no objection can be raised to your demonstration." Euverte Decl., Ex. A. He further stated, "[i]f you contravene [Order 707] you will be liable to prosecution under French law which as you know is sovereign in this area." *Id.*

Thus, Plaintiffs have failed to establish that the Republic of France waived its sovereign immunity pursuant to section 1605(a)(1).

### 2. The "Takings" Exception under Section 1605(a)(3).

■ Section 1605(a)(3) of the FSIA provides jurisdiction over a case:

> in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by a foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States....

28 U.S.C. § 1605(a)(3). Under this provision, the property at issue must have been taken in violation of international law. *Siderman,* 965 F.2d at 711. "At the jurisdictional stage, [the court] need not decide whether the taking actually violated international law; as long as a 'claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of [the court's] jurisdiction.'" *Id.,* citing *West,* 807 F.2d at 826.

Defendants contend that there has been no "taking" of Plaintiffs' property, that no property belonging to Greenpeace was "owned or operated" by France or any agency or instrumentality of France, and that France's seizure of Greenpeace's vessels did not violate international law. Memorandum at 16–19. Plaintiffs counter that France's conduct amounted to a "taking" in violation of inter-

national law, and that the FSIA's jurisdictional nexus test is met in this case. Opposition at 16–21.

### a. Plaintiffs Have Failed to Establish That There Was a "Taking" in Violation of International Law.

Plaintiffs contend that France's "indefinite seizure" of the *Manutea* caused an "extended deprivation of private property rights" which amounted to a taking in violation of international law.[8] Defendants, however, maintain that France's seizure of the *Manutea* was a temporary seizure of property used in the commission of a crime, and that such conduct is not a "taking" for purposes of international law, just as it is not a taking under the U.S. Constitution. Oxman Decl. ¶ 4; *see Cable Alabama Corp. v. City of Huntsville,* 768 F.Supp. 1484, 1508 (N.D.Ala.1991), *quoting Agins v. City of Tiburon,* 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980).

■ With respect to the "takings" exception to the FSIA, the Ninth Circuit has stated that:

> Determining whether an action by a government is a legitimate exercise of the police power in the regulation of its internal affairs as opposed to a taking of property can pose particularly difficult problems. Valid expropriations must always serve a public purpose; that public purpose in some cases may be so strong as to render lawful what otherwise might constitute a "taking." ... "The conclusion that a particular interference is an expropriation might also be avoided if the State ... had a purpose in mind which is recognized in international law as justifying even severe, although by no means complete, restrictions on the use of property...."

---

8. At oral argument, Plaintiffs' counsel urged that the "taking" at issue was the interference with Plaintiffs' lease agreement executed in the United States for the charter of the *Manutea,* which they claim was extinguished while the boat was held. Transcript at 5–6. This Court notes that the crude oil tanker bombed during the Falkland Islands War by the Argentina Republic was also the subject of a charter executed in the United States by one of the plaintiffs, the Amerada Hess Shipping Corporation. That charter too was essentially extinguished by the severe damage wrought by Argentina's military aircraft and the necessity of scuttling the tanker when it was

determined that an undetonated bomb lodged in a fuel tank could not safely be removed. The United States Supreme Court found that "none of the enumerated exceptions to the FSIA] apply to the facts of this case." *Amerada Hess,* 488 U.S. at 443, 109 S.Ct. at 693. Here, whether the "taking" at issue is the actual detention of the *Manutea* or the resulting interference with the charter executed in the United States, the applicable analysis is the same—namely, whether that taking was in violation of international law *and* whether the further requirements of section 1605(a)(3) are met.

*West,* 807 F.2d at 831 (citations omitted). Moreover, the Ninth Circuit has described three requisites under international law for a valid taking. First, "valid expropriations must always serve a public purpose." *Siderman,* 965 F.2d at 711. Second, "aliens [must] not be discriminated against or singled out for regulation by the state." *Id.* Finally, "an otherwise valid taking is illegal without the payment of just compensation." *Id. see West,* 807 F.2d at 831–32.

■ As a threshold matter, a claimant cannot complain that a taking or other economic injury has not been fairly compensated, and hence violates international law unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury. *Interhandel Case (Switzerland v. United States)* [1959] I.C.J.Rep. 6, 26–27 (the State where the violation has occurred should have an opportunity to redress takings by its own means, within the framework of its own domestic legal system); *see Restatement (Third) of the Foreign Relations Law of the United States* § 713 cmt. f; *see also* Oxman Decl. ¶¶ 6–8. In this case, Plaintiffs have made no attempt to pursue remedies with the French government based on the impoundment of the *Manutea,* even though such remedies are available, and even though Plaintiffs have apparently pursued such remedies based on the impoundment of other Greenpeace vessels. Oxman Decl. ¶ 8.

Furthermore, the undisputed evidence indicates that the impounded Greenpeace vessels were held in Hao and Mururoa at the direction of the Public Prosecutor as part of his investigation. Opposition at 10–11. The investigation encompassed numerous alleged violations by Greenpeace of international law. Bonnafont Decl., Ex. 8. As part of his investigation, the Prosecutor issued requests for information from the United States and the Netherlands concerning ownership of the impounded vessels. On March 1, 1996, while the investigation remained pending and the Prosecutor was awaiting responses to his inquiries from the United States and Netherlands, the Prosecutor announced that impoundment of the seized ships was no longer

necessary and that they would be returned to their owners. Euverte Decl ¶ 20; Bonnafont Decl., Ex. 9. On March 13, 1996, the Greenpeace vessels were returned to their owners. Thus, in seizing and impounding Greenpeace's vessels, France had a "purpose in mind which is recognized in international law as justifying even severe" restrictions on Greenpeace's property, and that such purpose was sufficiently strong "as to render lawful what otherwise might constitute a 'taking.'" *See West,* 807 F.2d at 831; *see also* Oxman Decl. ¶¶ 4–5.

Plaintiffs incorrectly assert France's conduct constituted a "taking" in violation of international law because France has failed to establish that "the arbitrary seizure of the *Manutea* bears any plausible relationship to a valid public purpose." Opposition at 16. The burden of adducing evidence to establish a taking in violation of international law is on Plaintiffs, not on Defendants, once they have established the presumption of immunity. *See Siderman,* 965 F.2d at 708, n. 9. Plaintiffs fail to present any evidence to refute Defendants' showing that the impoundment was necessary to France's investigation of Greenpeace's numerous alleged violations of international law.

Also, Plaintiffs have made no evidentiary showing that Defendants' conduct was "arbitrary" or "discriminatory." Although Plaintiffs assert that France has singled out Greenpeace in the past, and that Greenpeace is "informed and believes" that France treated a French vessel and its occupants more favorably than it treated Plaintiffs, Plaintiffs offer no evidence to support their position. *See* Opposition at 17–18. Their unsupported allegations are insufficient to establish a violation of international law. Finally, because Plaintiffs have failed to establish that a "taking" occurred, the Court need not consider the question of just compensation.

In sum, Plaintiffs have failed to carry their burden of demonstrating that the seizure and impoundment of the *Manutea* constituted a taking in violation of international law. Furthermore, even if Plaintiffs had met their burden of proof as to a taking in violation of international law, they still have not met the further requirements for establishing the ex-

ception to France's sovereign immunity under section 1605(a)(3).

**b. Plaintiffs Have Failed to Demonstrate That the Property Allegedly Taken Was Owned or Operated by France.**

 Section 1605(a)(3) of the FSIA further requires that (1) the property taken or property exchanged for that property be present in the United States in connection with a commercial activity of the foreign state, or (2) such property or property exchanged for that property be "owned or operated" by an agency or instrumentality of the foreign state doing commercial business in the United States. 28 U.S.C. § 1605(a)(3).

Neither the *Manutea* nor any other Greenpeace property is or was present in the United States in connection with a commercial activity of France. Therefore, Plaintiffs cannot establish the first prong of the above test. *See Security Pacific Nat'l Bank v. Derderian,* 872 F.2d 281, 285, n. 8 (9th Cir. 1989).

Nor have Plaintiffs made any showing which would satisfy the second alternative prong. In *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale,* 730 F.2d 195 (5th Cir.1984), the Fifth Circuit noted that the legislative history of the FSIA indicates that section 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state. *Id.* at 204, *citing* 1976 U.S.Code Cong. & Ad.News 6604, 6618. The court rejected the contention that "own" or "operate" may mean "possess" or "control," and stated:

> The vessel in this case thus would have been owned or operated under section 1605(a)(3) if ... some Algerian agency had assumed control of the vessel and had used it to carry oil for the benefit of the Algerian government. [¶] The record indicates that no act of [the Algerian governmental agency] resembled this scenario.

*Id.* at 204.

In this case, under *Vencedora,* Greenpeace's vessels would have been owned or operated under section 1605(a)(3) if France

or some French agency had assumed control of the vessel and had used it for the benefit of the French government. *See Vencedora,* 730 F.2d at 204 (holding seizure and towing of ship falls short of ownership or operation). Plaintiffs have made no showing whatsoever in this regard, and the undisputed evidence indicates otherwise.

 Thus, even if this Court were to find that Greenpeace's property was taken in violation of international law by France, Plaintiffs have failed to meet their burden of proving an exception to the FSIA under section 1605(a)(3). Plaintiffs have failed to demonstrate that they have a "substantial" and "nonfrivolous" taking claim, and therefore the takings exception to sovereign immunity under section 1605(a)(3) does not apply. *See Siderman,* 965 F.2d at 711.

**3. The Noncommercial Tort Exception Under Section 1605(a)(5).**

Section 1605(a)(5) of the FSIA provides jurisdiction in cases:

> against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—
>
> (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
>
> (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights. . . .

28 U.S.C. § 1605(a)(5).

 Plaintiffs assert this non-commercial torts exception to sovereign immunity first, with respect to acts allegedly committed by Air France personnel upon plaintiffs Baker and Whiting while stopped in Los Angeles in transit to Paris, Baker Decl. ¶¶ 5–10; and second, with respect to alleged tortious acts by French crew members on board a military flight while temporarily grounded in Los An-

geles. Mills Decl. ¶¶ 5–7; Nicholls Decl. ¶¶ 5–7. For the reasons set forth below, the Court finds that none of these activities constituted torts occurring entirely within the United States. The Court further concludes that, in any event, claims based upon the conduct of Air France personnel are properly directed at Air France, not the Republic of France, a separate legal entity within the FSIA; and claims based upon the conduct of the French Military are governed exclusively by the Status of Forces Agreement between and among the United States, France, and other members of NATO.

### a. Plaintiffs have failed to demonstrate that any of the alleged acts constitute torts that occurred entirely within the United States.

As stated by the Ninth Circuit, section 1605(a)(5) "applies to non-commercial torts and requires not only that the personal injury or property damage occur in the United States, but that the tortious act or omission occur here." *Security Pacific Nat'l Bank v. Derderian, supra,* 872 F.2d at 281, 285, n. 8.[9] Jurisdiction under section 1605(a)(5) requires "at least one entire tort occurring within the United States." *Olsen v. Government of Mexico,* 729 F.2d 641, 646 (9th Cir.), *cert. denied,* 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984).

Relying heavily on *Olsen* Plaintiffs contend that this Court has jurisdiction over the entirety of its claims if any "entire tort" took place in the United States. Because some of the alleged tortious acts occurred in the United States, Plaintiffs conclude that each of their causes of action constitutes an "entire tort" occurring in the United States, sufficient to confer subject matter jurisdiction under section 1605(a)(5). Plaintiffs are mistaken.

In *Olsen,* an airplane departed from Mexico with a planned destination also in Mexico, but found itself due to adverse weather con-

ditions in United States airspace attempting an instrument landing, when it crashed in the United States, killing all on board. After describing a number of 'potentially tortious acts and omissions occurring both in Mexico and the United States' the Court observed that the plaintiffs had "alleged conduct constituting a single tort—the negligent piloting of the aircraft—which occurred in the United States." *Olsen,* 729 F.2d at 646.[10] The Court held that "if plaintiffs allege at least one entire tort occurring in the United States, they may claim under section 1605(a)(5)." *Id.*

Contrary to Plaintiffs' contentions, *Olsen* does not extend FSIA jurisdiction to tortious conduct occurring overseas. Such a conclusion would be contrary to well established law. *See Von Dardel v. Union of Soviet Socialist Republics,* 736 F.Supp. 1, 7 (D.D.C. 1990) (statute requires that "the entirety of the tort occur in the United States"); *Coleman v. Alcolac, Inc.,* 888 F.Supp. 1388 (S.D.Tex.1995) (exception not applicable because alleged tort "did not occur wholly in this country"); *Four Corners Helicopters, Inc. v. Turbomeca S.A.,* 677 F.Supp. 1096 (D.Col.1988) ("It is clear that in order for the exception to apply, the entire tort must have occurred in the United States"); *Antares Aircraft L.P. v. Federal Republic of Nigeria,* 1991 WL 29287 (S.D.N.Y.1991) ("It is well-recognized that for the non-commercial tort exception to apply, the entire tort must occur in the U.S."). Thus, only those torts which occurred entirely within the United States support jurisdiction under section 1605(a)(5).

In this case, Plaintiffs maintain that the acts of French military personnel on board the September 3, 1995 French military flight, and the acts of Air France personnel on board the September 9, 1995 commercial Air France flight constitute independent torts occurring entirely within the United States and support the exercise of this Court's jurisdiction under section 1605(a)(5).

---

9. According to the Supreme Court, "Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law." *Amerada Hess,* 488 U.S. at 439–40, 109 S.Ct. at 690–91.

10. Specifically, the allegation was that a pilot negligently failed to maintain altitude, hit a telephone pole, and crashed causing deaths, all wholly within the United States. *Olsen,* 729 F.2d at 644.

### (1) French military flight.

With respect to the French military flight, Plaintiffs allege that French soldiers continued to "forcibly, involuntarily, and illegally" detain individual plaintiffs Huckleberry, Schwarz, Mills, Pupuka and Nicholls in Los Angeles and that certain of these individuals were prevented from deplaning with Huckleberry. Complaint ¶¶ 22–23. The conduct complained of lacks the required nexus with the United States because its "essential locus" was in Hao. At most, Plaintiffs' allegations indicate that certain individual plaintiffs suffered continuing "ill effects" of their seizure and expulsion in Los Angeles, and do not demonstrate an independent tort occurring entirely within the United States. *See Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517, 1525 (D.C.Cir. 1984), *cert. denied,* 470 U.S. 1051, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985) (conduct complained of lacks "required nexus" with the United States because its "essential locus" was in Mexico); *see also McCune v. Grand Rapids,* 842 F.2d 903 (6th Cir.1988) ("claim for wrongful continued incarceration constitutes an ill effect from [claimant's] false arrest," not a separate tort), *citing Ward v. Caulk,* 650 F.2d 1144, 1147 (9th Cir.1981) (continuing ill effects from an original violation do not constitute a continuing violation).

### (2) Air France flight.

With respect to the Air France flight, Plaintiffs allege that individual plaintiffs Baker and Whiting "were physically struck and prohibited by means of involuntary bodily contact from deplaning by one or more agents and/or employees of France and/or Air France." Complaint ¶ 24. These allegations, if proven, would support independent torts of assault and battery or intentional infliction of emotional distress, the entirety of which occurred in the United States.

However, while Plaintiffs have alleged potentially independent torts against Baker and Whiting occurring entirely within the United States, they fail to present adequate proof of these allegations to overcome the presumption of immunity. *Siderman,* 965 F.2d at 708, n. 9. Despite the clear requirement of *Siderman,* Plaintiffs stubbornly insist that the unsubstantiated allegations in the Complaint are sufficient to defeat the instant motion. Plaintiffs were advised of the *Siderman* requirements at the July 29 hearing, and given the opportunity to adduce evidence meeting their burden by declaration following the hearing. The only evidence presented by Plaintiffs to support their claim that Baker and Whiting were assaulted is in the Baker Declaration, ¶¶ 8 and 9. Baker asserts that Air France personnel blocked his exit in Los Angeles, and:

> Much to my shock and dismay, the Air France personnel began accosting both myself [sic] and Matthew Whiting ... and it was particularly cruel in my view that Air France personnel were literally jumping on [Whiting] and trying to wrestle him back into the plane forcibly. I was extremely apprehensive that Matthews [sic] and I would be beaten or otherwise (further) physically harmed at this point....

Baker Decl. ¶ 9.

Despite the Court's invitation to do so, Plaintiffs failed to submit a declaration by Mr. Whiting on this point. Thus, the essence of Plaintiffs' offer is that they were blocked and accosted by Air France personnel after being put on board a commercial aircraft by French military personnel. These vague and general allegations are completely undermined by Defendants' detailed evidentiary submissions. Plaintiffs have not met their burden of proof. At most, Plaintiffs' evidence establishes a "continued detention" of Baker and Whiting by Air France personnel—not the Republic of France—which began in the South Pacific, continued through Los Angeles, and terminated in France. The "essential locus" of the alleged tortious acts was outside the United States, and does not support the exercise of the Court's jurisdiction. *See Asociacion de Reclamantes,* 735 F.2d at 1525; *McCune,* 842 F.2d 903. Moreover, Plaintiffs' vague claim that Air France personnel were "literally jumping" on Whiting is insufficient when considered with Defendants' detailed evidence that any physical contact with Whiting during the stopover in Los Angeles was incidental, and resulted from the refusal of Baker and Whiting to wait to be escorted to the transit lounge. Neto Decl. ¶¶ 7–10. Accordingly, Plaintiffs

have failed to make an adequate showing that the "noncommercial tort" exception of section 1605(a)(5) applies.[11]

**b. Plaintiffs' claims based on the conduct of Air France personnel are properly directed only at Air France—not the Republic of France—which is a separate legal entity for purposes of the FSIA.**

Plaintiffs have failed to adequately establish that Air France personnel committed at least one entire tort within the United States. In any event, claims based on the conduct of Air France personnel are properly directed at Air France, and not the Republic of France.

Under section 1603 of the FSIA, a "foreign state" is defined to include "an agency or instrumentality ... a majority of whose shares or other ownership interest is owned by [the] foreign state or political subdivision thereof." 28 U.S.C. § 1603. However, the FSIA was not "intended to affect the substantive law determining the liability of a foreign state or instrumentality, or the attribution of liability among instrumentalities of a foreign state." *First National City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 620, 103 S.Ct. 2591, 2597, 77 L.Ed.2d 46 (1983). The FSIA "presumes that separate juridical entities are normally to be treated as independent from one another." *Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir.1995).

The Supreme Court, however, has articulated two exceptions to the presumption of independence: (1) where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created; or (2) where to give effect to the entities' separate form would work fraud or injustice. *First National City Bank*, 462 U.S. at 629, 103 S.Ct. at 2601; *Gates*, 54 F.3d at 1464.

In this case, Plaintiffs do not deny that, ordinarily, a plaintiff may not attribute the independent acts or liability of a separate agency or instrumentality to the foreign state itself. Rather, Plaintiffs argue that exceptional circumstances exist in this case. According to Plaintiffs, the Republic of France is liable for the acts of Air France because Air France acted as the Republic of France's alter ego in authorizing the alleged United States based torts. Opposition at 14, *citing First National City Bank*, 462 U.S. 611, 629, 103 S.Ct. 2591, 2601, 77 L.Ed.2d 46 (1983). Plaintiffs fail to present any evidence, or even to articulate specific allegations, which would support a finding of alter ego liability, and have therefore failed to carry their burden.[12]

Accordingly, Plaintiffs' claims against France based on the conduct of Air France personnel are improper, and cannot support the exercise of jurisdiction under the FSIA.

**c. Claims based upon the conduct of French military personnel are governed exclusively by the Status of Forces Agreement.**

Plaintiffs have failed to adequately establish that French military personnel committed at least one entire tort within the United States. Even assuming that Plaintiffs had demonstrated the requisite independent tort, however, their claims based upon the conduct of the French military would be governed by the North Atlantic Treaty Organization Status of Forces Agreement ("NATO–SOFA") and could not be adjudicated by this Court.

The FSIA was enacted "[s]ubject to existing international agreements to which the United States is a party." 28 U.S.C. § 1604. The House Report accompanying the legislation makes clear that, "[l]ike other provisions [of the FSIA]," the exceptions to immunity in section 1605 are "subject to existing interna-

---

11. The Court further notes that allowing Plaintiffs additional discovery on this point is not appropriate. Any evidence supporting their position is entirely in Plaintiffs' own hands, and they have failed to produce it despite ample opportunity. *See* discussion, *infra*, at 788–89; *Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1011 (2d Cir.1986).

12. As Defendants point out, Air France has, in fact, been treated as a separate entity by United States courts. *See e.g. Air France v. Saks*, 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).

tional agreements (see section 1604) including Status of Forces Agreements." H.R.Rep. No. 94–1487 at 21, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 6620. Thus, "if a remedy is available under a Status of Forces Agreement, the foreign state is immune from such tort claims as are encompassed in section 1605(a)(2) and 1605(a)(5)." *Id.*

■■■■■ The Republic of France and the United States, as signatories to NATO–SOFA, have established an exclusive jurisdictional framework for tort claims arising out of acts allegedly committed by visiting members of the armed forces of the other country. Under NATO–SOFA:

> Claims ... arising out of acts or omissions of members of a force or civilian component done in the performance of official duty, or out of any other act, omission or occurrence for which a force or civilian component is legally responsible, causing damage in the territory of the receiving State to third parties ... shall be dealt with by the receiving State in accordance with the following provisions:

> (a) Claims shall be filed, considered and settled or adjudicated in accordance with the laws and regulations of the receiving State with respect to claims arising from the activities of its own armed force....

Art. VIII, ¶ 5. Under the framework established by NATO–SOFA, the foreign serviceman is "merged" or "assimilated" into the United States military for the purposes of claims arising out of the acts or omissions of that foreign serviceman. *See Daberkow v. United States*, 581 F.2d 785 (9th Cir.1978). The third party must pursue such claims as though he or she were injured by the armed forces of the host nation itself. Under NATO–SOFA, the courts lack jurisdiction over tort claims based on the acts or omissions in the performance of official duty of members of the military forces of NATO countries while present in the United States. *See e.g. Brown v. Ministry of Defense of the United Kingdom*, 683 F.Supp. 1035, 1040 (E.D.Va.1988).

In this case, Plaintiffs do not dispute that their allegations against French military personnel relate to acts done "in the performance of official duty."[13] They claim, however, that NATO–SOFA does not apply because (1) the French soldiers who committed the alleged torts were not part of a "force" under NATO–SOFA; (2) the French soldiers were not engaged in NATO related activities; and (3) application of NATO–SOFA to the instant situation would grant French military personnel "undue privileges and immunities." Opposition at 10–13. Plaintiffs' contentions are without merit, and are directly contradicted by the express terms of NATO–SOFA, as well as relevant case law.

■■■■ The French soldiers about which Plaintiffs complain were, at all relevant times, members of the French armed forces on active duty. Cambraye Decl. ¶ 7. They were transporting various individual plaintiffs from Hao to Paris, with a 90 minute stopover in Los Angeles, pursuant to an Order from the High Commissioner. Cambraye Decl. ¶ 2. Thus, under NATO–SOFA, these French military personnel were members of a "force" and were engaged in the performance of "official duty" when they engaged in the allegedly tortious conduct which caused damage in the United States. Art. I, ¶ 1(a); *see* 32 C.F.R. 842.70(c). Moreover, NATO–SOFA does not require troops to be present "in connection with" the operation of the North Atlantic Treaty. Rather, NATO–SOFA adopts "a simple geographical, not a purposive test, for applicability of the treaty." *Aaskov v. Aldridge*, 695 F.Supp. 595 (D.D.C.1988) (NATO connection is not essential to applicability of the treaty). Finally, in that Plaintiffs are free to pursue their remedies in accordance with NATO–SOFA's remedial scheme, application of NATO–SOFA would not grant France or its troops any "undue privileges or immunities."

Thus, Plaintiffs' claims based upon the conduct of the French military occurring within the United States are governed exclusively by NATO–SOFA, and may not be adjudicated by this Court. *See e.g., Brown*, 683 F.Supp. at 1040.

**13.** Plaintiffs do, however, request discovery on this issue. *See* Opposition at 14.

**B. Plaintiffs' Request for Discovery Is Denied.**

Plaintiffs urge that "if the Court decides to treat this motion to dismiss under Rule 12(b)(1) standards and evaluates for itself the merits of jurisdictional claims, the Court should still allow plaintiffs the discovery necessary to make their claim to jurisdiction under these facts." Opposition at 7.[14]

 Courts permit discovery on jurisdictional issues only if such discovery is necessary and "if it is possible that the plaintiff [could] demonstrate the requisite jurisdictional facts if afforded that opportunity." *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir.), *cert. denied*, 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539 (1989). In addition, discovery is permitted only "where the facts are peculiarly within the knowledge of the opposing party." *Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1011 (2d Cir.1986). It is an abuse of discretion to dismiss for lack of subject matter jurisdiction without giving plaintiff reasonable opportunity, if requested, to conduct discovery for this purpose. Schwarzer, Tashima & Wagstaffe, ¶ 9:108; *Siderman*, 965 F.2d at 713.

With respect to the waiver of sovereign immunity exception under section 1605(a)(1), discovery could not possibly enable Plaintiffs to establish jurisdiction. Additional discovery could not alter the plain language of the treaties upon which Plaintiffs rely nor of Vice Admiral Euverte's letter of September 3, 1995.

With respect to the takings exception under section 1605(a)(3), discovery would likewise be futile. Plaintiffs cannot establish that a "taking" occurred or that the French government ever "owned or operated" any of Plaintiffs' property. Moreover, even if Plaintiffs could, through discovery, establish that France expropriated their property, they have not pursued or exhausted French domestic remedies.

With respect to the noncommercial tort exception under section 1605(a)(5), the only conduct which could possibly support jurisdiction arises from the alleged beatings of individual plaintiffs Baker and Whiting by Air France personnel. These allegations fail, however, because Plaintiffs have failed to meet their evidentiary burden of showing that such beatings occurred, even though facts supporting such allegations are "peculiarly within the knowledge of" Plaintiffs. *See Kamen*, 791 F.2d at 1011. Moreover, Plaintiffs were given ample opportunity to adduce the evidence within their control at the hearing and thereafter. They failed to do so.[15] Absent such evidence, allowing Plaintiffs to conduct discovery relating to such issues as the applicability of NATO–SOFA or alter ego liability would not enable them to establish jurisdiction. Moreover, even if they presented evidence to support their allegations, the Republic of France may not be held liable for the acts of Air France absent some showing that Air France acted as France's alter ego in authorizing the alleged United States based torts. Plaintiffs have not presented any evidence of alter ego liability, nor have they shown that such evidence might be obtained through discovery.

Accordingly, Plaintiffs' request for additional discovery must be denied. Plaintiffs have failed to show any possibility that they might demonstrate the requisite jurisdictional facts if afforded the opportunity for additional discovery. *See St. Clair*, 880 F.2d at 201.

### III. CONCLUSION

During the July 29, 1996 hearing, the Court explained to Plaintiffs' counsel that Plaintiffs must present evidence to establish the applicability of an exception to the FSIA,

---

**14.** Specifically, Plaintiffs request the opportunity to conduct discovery pertaining to (1) the application of NATO–SOFA to Plaintiffs' claims against French military personnel, Opposition at 14; Post–Hearing Opposition at 5–6; (2) Air France's alter ego status, and whether Air France employees acted at the direction and/or order of the French military, Opposition at 15; Post–Hearing Opposition at 6; and (3) whether France violated international law by seizing Plaintiffs' vessels, Opposition at 17–18; Post–Hearing Opposition at 8–9.

**15.** For example, Plaintiff Matthew Whiting never submitted a declaration concerning the beating he allegedly suffered at the hands of Air France personnel.

and granted Plaintiffs additional time to gather and present evidence in support of their position. Notwithstanding the granting of additional time, Plaintiffs have failed to carry their burden of introducing evidence that one of the FSIA exemptions applies. Accordingly, the Court hereby **GRANTS** Defendants' motion to dismiss this action with prejudice for lack of subject matter jurisdiction over the Republic of France.

Because Plaintiffs have failed to demonstrate proper service of the summons and complaint upon the individual defendants after notice, this action is dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) as to them.[16]

**IT IS SO ORDERED.**

---

**16.** Even if Plaintiffs could prove that the individual defendants were properly served in this action, they would be immune from suit under the FSIA. Plaintiffs' allegations against the individual defendants relate solely to acts committed in their official capacities. Under Ninth Circuit law, an individual sued in his official capacity is an "agency or instrumentality of a foreign state" under the FSIA, and, as such, is immune to the same extent as the foreign state itself. *Chuidian v. Philippine National Bank*, 912 F.2d 1095, 1099–1103 (9th Cir.1990); 28 U.S.C. §§ 1603(a), (b).