Louis **TOMASELLO**, Jr., Appellant,

v.

Robert E. **RUBIN**, Secretary, Department of the Treasury, Appellee.

No. 97–5233.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 6, 1998.

Decided Feb. 23, 1999.

John F. Karl, Jr. argued the cause for the appellant. John W. Davis entered an appearance for the appellant.

Rudolph Contreras, Assistant United States Attorney, argued the cause for the appellee. Wilma A. Lewis, United States Attorney, and R. Craig Lawrence, Assistant United States Attorney, were on brief for the appellee.

Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LECRAFT HENDERSON,
Circuit Judge:

Appellant Louis Tomasello, formerly employed by the Alcohol Tobacco and Firearms Bureau (ATF) of the United States Department of the Treasury (Treasury), sued Treasury, making numerous claims arising from ATF's alleged violations of the Privacy Act, 5 U.S.C. § 552a, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 633, and Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq., during his long-time employment as an ATF agent. Using an advisory jury, the district court conducted a bench trial and at its conclusion awarded Tomasello $2000 under the Privacy Act, dismissed the ADEA retaliation claims based on sovereign immunity, granted judgment as a matter of law to Treasury on the Title VII hostile work environment and constructive discharge claims and rejected the advisory jury's verdict in Tomasello's favor on the Title VII claims arising before November 1991. With respect to the post-November 1991 Title VII claims, the jury heard and rejected them. Tomasello raises several challenges on appeal: (1) he is entitled under the Privacy Act to $1,000 for each violation; (2) damages under the Privacy Act are not limited to pecuniary losses; (3) the district court improperly dismissed his ADEA retaliation claims based on sovereign immunity; (4) the pre-November 1991 discrimination claims should have been tried by the jury as part of a continuing violation; (5) the hostile work environment and constructive discharge claims should have been submitted to the jury; and (6) in rejecting the advisory jury's verdict on Tomasello's pre-November 1991 Title VII retaliation claims, the district court erred in finding no retaliation based on Tomasello's failure to establish a causal connection between his discrimination complaints and his nonpromotions. Although we do not reach the issues of the availability of non-pecuniary damages under the Privacy Act and whether the government has waived its sovereign immunity from an ADEA retaliation claim, we affirm the district court in all other respects.

I.

Tomasello, a Sicilian–American, joined ATF in March 1971. In 1980 ATF posted Tomasello to Boston as a senior operations officer. In 1983 ATF named Terence McArdle, an Irish–American, its special agent in charge (SAC) in Boston. There followed a series of events that Tomasello claims demonstrated discrimination by Irish–American ATF personnel against Italian–American ATF personnel.

In 1984 Tomasello was investigated for allegedly associating with members of the Mafia. That year, Tomasello alleged, McArdle remarked to him "Why can't I say 'guinea' in front of an Italian?," JA 306—a remark McArdle denied making.

In 1985 McArdle appointed Tomasello as supervisor of Group B, a group of criminal investigators, after becoming disappointed with the performance of William Pickett, an Irish–American, as Group B supervisor. Tomasello claimed that Group B's morale and performance improved under his leadership but that McArdle subsequently undercut his performance by replacing experienced agents with inexperienced ones.

In May 1987 McArdle selected John Dowd, an Irish–American, over Tomasello as a supervisory criminal investigator although, Tomasello claimed, he was better qualified than Dowd and McArdle had once referred to Dowd as "the worst supervisor in New England." JA 709.

In 1988, according to Tomasello, he approached McArdle and complained about what he thought were McArdle's inappropriate and discriminatory remarks. A few months later Tomasello's annual performance evaluation, completed by assistant SAC (ASAC) Darrell Dyer, included an overall rating of "Fully Successful"—two levels below the "Outstanding" rating Tomasello had received the year before but nevertheless consistent with the majority of his annual evaluations.

In October 1988 McArdle reprimanded Tomasello and other agents for playing golf instead of attending a mandatory meeting during a two-day ATF seminar. The incident was included in Tomasello's subsequent

performance appraisal because Tomasello was the only supervisor to have missed the mandatory meeting.

In February 1989 Tomasello met with McArdle to discuss Tomasello's complaints of discrimination. Shortly thereafter, ASAC Dyer sent Tomasello a letter requesting additional information about an emergency expense fund expenditure Tomasello had approved. ATF headquarters had requested the information from Dyer. Tomasello admitted the expenditure form was incorrect but attributed the error to misleading instructions. Dyer also questioned Tomasello's request for funds for a Lincoln Town Car.

In May 1989 Tomasello wrote a "position paper" outlining what he believed to be McArdle's discriminatory treatment of him. He gave the paper to McArdle and eventually it went to ATF's chief counsel's office in Washington, D.C. Tomasello claims that subsequently McArdle began a campaign to recruit Italian–Americans in an effort to blunt his complaints of discrimination. According to Tomasello, in November of that year McArdle recruited Peter Gagliardi, an Italian–American, to take over Project Achilles (a group Tomasello had helped establish to work with local law enforcement in apprehending armed career criminals). In November, McArdle appointed Gagliardi to that position. When Gagliardi was promoted and relocated to Washington, D.C. six months later,[1] Frank Hart, who had run a similar program in Chicago and had already been slated to fill a different position in Boston, transferred laterally into the vacant position. Tomasello had by then been transferred to the Concord, New Hampshire office (allegedly to prevent him from receiving extra locality pay available to Boston agents).[2] Because, according to Tomasello, announcement of the opening was withheld from the Concord office, he was barely able to meet the application deadline. When Hart was selected for the position, Tomasello applied for the position. Hart had been intended to fill but instead Michael Catlett, an Italian–American, was chosen.

On November 26, 1990 Tomasello filed the first of eight complaints with ATF's equal employment opportunity officer. Tomasello contends that this action triggered a series of retaliatory acts beginning with McArdle's taunt "[W]hatever you give me, I'll give you back double."

In early 1991 while Tomasello was conducting training in Glynco, Georgia, he asked ASAC Dyer about reimbursement for additional return trips to Boston. Before faxing his response, Dyer telephoned the Georgia training facility and told the individual he spoke with that he was sending a fax and that it contained confidential information. Although Tomasello presented no evidence that anyone other than the person to whom Dyer spoke saw the fax (which mentioned his EEO complaint), he alleged that once the fax arrived, the "atmosphere changed." JA 558–59. This incident formed the basis of Tomasello's first Privacy Act claim.

On June 26, 1991 ASAC Dyer reprimanded Tomasello after he had requested to attend a two-day state law enforcement conference to improve relations between ATF and local law enforcement but failed to show up. The night before the conference Tomasello, who was the only ATF agent scheduled to attend, had a "flare-up" of a chronic illness. Tomasello missed the second day because he could not find transportation. He failed, however, to inform his superiors that he could not attend either day.

In November 1992 the CBS "60 Minutes" television program prepared a segment on alleged discrimination at ATF during which both ATF Director Stephen Higgins and Tomasello were separately interviewed. Higgins then notified CBS by letter that the interviewed agent, whom he did not identify in his letter, had filed a discrimination complaint against ATF. When the interview was televised, Tomasello was referred to by name as having filed a discrimination complaint. Higgins later faxed the letter he had sent to CBS to 4,500 ATF agents nation-wide. This

---

1. By the time of trial, Gagliardi was fourth in command at ATF.

2. Tomasello claimed that he had objected to being moved to Concord although he had more than once expressed a desire to transfer there.

incident formed the basis of Tomasello's second Privacy Act claim.

On January 27, 1993 Tomasello received a memorandum from McArdle regarding his improper disposal of a handgun. Tomasello claimed that the disposal method he used was "clearly authorized." McArdle disagreed, claiming that Tomasello should have returned it to local authorities because ATF had not sought forfeiture of the gun.

In October 1993 Tomasello requested reimbursement for travel expenses to a retirement conference held near his "primary residence." He claimed travel expenses from his "secondary residence." ASAC Thomas Lambert, Tomasello's supervisor in Concord, initially questioned the expenses but, after consultation with ATF's chief counsel's office, changed his position.

On December 28, 1993 Nealy Earl, an ATF EEO counselor in Hartford, Connecticut sent a copy of Tomasello's precomplaint counseling form to ATF's EEO Complaint Center in Chicago and to John McGuire, ATF's EEO Regional Manager in New York. In early January 1994 Earl requested that McGuire fax him a copy because he no longer had his copy of the form and the Chicago office had not received it. While faxing the document, McGuire noticed a "paper jam" message on the fax machine and, assuming the document had not been successfully sent, refaxed it. Earl, however, had received the first transmission and left his office for the day. In his absence, the second fax was received by his supervisor who placed it in a sealed envelope and gave it to Earl later. This incident provides the basis of Tomasello's third Privacy Act claim.

According to Tomasello, eventually the conditions of his employment became unbearable and he was forced to resign. In February 1994 Tomasello notified ATF he was resigning to take a position with the Environmental Protection Agency in Boston. Tomasello then filed this action.

The district court treated Tomasello's third amended complaint, his last, as alleging numerous Title VII and ADEA discrimination and retaliation claims. Relevant to his appeal are Tomasello's ADEA and Title VII retaliation claims with respect to (1) the McArdle, Dyer and Lambert memoranda; (2) the selection of Gagliardi and then Hart as Project Achilles supervisor; and (3) the selection of Catlett for arson group supervisor. Tomasello also alleged that he was subjected to a hostile work environment and constructively discharged. Additionally, Tomasello alleged three Privacy Act violations[3] arising from: (1) the Glynco fax; (2) the Higgins letter to CBS that was later sent to 4,500 ATF agents; and (3) the McGuire fax to Early. The district court dismissed the ADEA retaliation claims,[4] concluding that the United States had not waived its sovereign immunity. *See Tomasello v. Rubin,* 920 F.Supp. 4, 6 (D.D.C.1996). Relying on *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the lower court also rejected Tomasello's demand for a jury trial on his pre-November 1991 Title VII claims[5] as part of a continuing violation, concluding that a jury trial on those claims would give them impermissibly retroactive treatment. It decided, however, to convene an advisory jury as to the claims. *See* 920 F.Supp. at 7–8.

The case proceeded to trial with an advisory jury on the pre-November 1991 Title VII

---

**3.** Originally Tomasello also alleged a Privacy Act violation involving a "blue ribbon panel" created after the "60 Minutes" program to investigate ATF's record on discrimination. Tomasello alleged that his records were illegally released to the panel. The district court dismissed the claim, finding that Tomasello had failed to demonstrate an "adverse effect." JA 127–28.

**4.** The district court granted summary judgment on Tomasello's ADEA discrimination claims. The Gagliardi promotion claim was rejected because Gagliardi was " 'insignificantly younger' " than Tomasello. JA 189 (quoting *Celotex v. Ca-*

*trett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The district court also rejected claims arising from the Catlett transfer and a later transfer between Hart and Terence Berry, who had replaced Catlett as arson group supervisor, because Tomasello presented no evidence that he had been "considered and rejected" for the positions. JA 200 n.1.

**5.** Tomasello pursued several other Title VII claims in district court but abandoned them on appeal. *See* JA 63–64; JA 65; JA 68–69; JA 71–72; JA 73–74; JA 123–124.

and Privacy Act claims. After hearing the evidence, the district court granted judgment to ATF on Tomasello's hostile work environment and constructive discharge claims, concluding that the alleged conduct was not sufficiently severe or pervasive to affect Tomasello's conditions of employment. The jury in its advisory capacity found that ATF did not discriminate against Tomasello on the basis of national origin but that it did retaliate in violation of Title VII by promoting Gagliardi and Hart over him and recommended a $5,000 damages award. Also in its advisory capacity, the jury found three Privacy Act violations based on the Glynco fax, the Higgins letter and the McGuire fax. The jury recommended a $5000 damages award for these violations as well. On the post-November 1991 Title VII claims (which were tried to the jury), it found that ATF neither discriminated nor retaliated in sending any of the documents.

The district court rejected the advisory verdicts in favor of Tomasello on the Title VII retaliation claims and all of the Privacy Act claims save the one arising from the Higgins letter. Accordingly, it reduced the Privacy Act award from $5,000 to $2,000 and eliminated the Title VII award. *See* JA 1624. The district court also denied Tomasello's motion to reconsider its judgment as a matter of law on the hostile work environment and constructive discharge claims. *See* JA 1615. Tomasello then appealed (1) the district court's order denying a jury trial on the pre-November 1991 Title VII claims and dismissing the ADEA retaliation claims as well as its subsequent denial of Tomasello's motion to reconsider; (2) the district court's judgment as a matter of law on the hostile work environment/constructive discharge claims and its subsequent denial of Tomasello's motion to reconsider; (3) the district court's rejection of the advisory jury verdicts on Tomasello's pre-November 1991 retaliation claims; and (4) the district court's reduction of the advisory $5,000 Privacy Act damages award and its refusal to award $1,000 per copy of the Higgins letter sent to the 4,500 ATF agents.

## II.

Tomasello raises a number of issues on appeal. With respect to his Privacy Act claim arising out of Higgins's letter to CBS, he contends that damages under the Privacy Act are not limited to pecuniary loss and that he is entitled to the statutory $1,000 penalty for each of the approximately 4,500 copies of the Higgins letter faxed to ATF agents nation-wide. Regarding his ADEA retaliation claims, he claims their dismissal on sovereign immunity grounds was improper. He further claims that the district court erred in not submitting the pre-November 21, 1991 Title VII discrimination claims to the jury as part of a continuing violation and in dismissing the hostile work environment and constructive discharge claims. Finally Tomasello claims that the district court erred in concluding that he had failed to causally connect his protected activity with ATF's allegedly retaliatory action. We address the claims *seriatim*.

## A. Privacy Act

Noting that the Privacy Act provides that "no agency shall disclose any record which is contained in a system of records by any means of communication to any person," 5 U.S.C. § 552a(b), Tomasello argues that he is entitled to $1,000 for each copy of the Higgins letter sent to the ATF agents. We review this claim de novo, *see Chandler v. Roudebush,* 425 U.S. 840, 863–64, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976), and affirm the district court.

The Privacy Act damages provision provides that:

> In any suit brought under the provisions of subsection (g)(1)(C) or (D) of this section in which the court determines that the agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of—
>
> > (A) actual damages sustained by the individual as a result of the refusal or failure, but in no case shall a person entitled to recovery receive less than the sum of $1,000, and

.    .    .    .    .

5 U.S.C. § 552a(g)(4). This provision of the Privacy Act is a waiver of sovereign immunity and, as such, "must be construed strictly in favor of the sovereign, and not enlarge[d] ... beyond what the language requires." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) (citation omitted) (alterations in original). Here, the $1000 figure seems to refer to each time the agency "acted" or to each "refusal or failure." 5 U.S.C. § 552a(g)(4). While it may be linguistically possible to read the language so as to forbid the aggregation of several more-or-less contemporaneous transmissions of the same record into one "act[ ]" or "failure [to comply with the Privacy Act]," the result Tomasello seeks shows that such a reading defies common sense. If an agency revealed a record on C–SPAN, reaching millions of viewers, it would then be liable for billions in damages, according to Tomasello. Reasonable aggregation here is not merely "plausible"—all that is required under *Nordic Village*, see 503 U.S. at 37, 112 S.Ct. 1011—but proper. Accordingly, we conclude that each letter disclosure is not independently compensable.[6]

## B. ADEA Retaliation

■ Tomasello next challenges the district court's dismissal of his ADEA retaliation claims based on sovereign immunity. As we explain below, however, we need not decide the question. *Cf. Washington v. Washington Metro. Area Transit Auth.*, 160 F.3d 750, 753

(D.C.Cir.1998) ("Because our resolution of the timeliness issue disposes of Washington's ADEA and Title VII claims, we need not reach the question whether his ADEA claim is nonetheless barred by the Eleventh Amendment.").

■ Tomasello's Title VII and ADEA retaliation claims were based upon his "position paper," which he characterized as protected activity, and arose from the same allegedly retaliatory actions—e.g. non-selections, transfers, negative appraisals and critical memoranda. Both the district court, evaluating the pre-November, 1991 Title VII claims, and the jury, evaluating the post-November 1991 Title VII claims, found that ATF did not retaliate against Tomasello. Where Seventh Amendment[7] concerns are not implicated, as they are not regarding Tomasello's ADEA retaliation claims, and there are overlapping issues, as there are here with respect to the nexus between Tomasello's submission of his position paper and ATF's allegedly retaliatory actions and with respect to Tomasello's qualifications measured against Hart's and Gagliardi's, remand to the district court is unnecessary despite improper dismissal of one of the claims. *See Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 146 F.3d 983, 988–89 (D.C.Cir.1998) (rejecting issue preclusion claim after district court improperly decided issue of fact that should have initially been decided by jury where Seventh Amendment *was* implicated).[8]

---

**6.** Tomasello now claims that the district court also erred in not awarding damages for emotional distress. We do not reach this claim because he failed to raise it below. "Absent 'exceptional circumstances,' the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a timely manner in proceedings below." *Kattan by Thomas v. District of Columbia*, 995 F.2d 274, 278 (D.C.Cir. 1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 71 (1994).

**7.** The Seventh Amendment provides in part:

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.... U.S. Const. amend. VII.

**8.** The holding in *Material Supply* draws from the Supreme Court's opinion in *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990). In *Lytle*, the district court

had dismissed the plaintiff's section 1981 claims after concluding that Title VII provided the exclusive remedy. The district court subsequently conducted a bench trial on the Title VII claims and ultimately entered judgment for the defendant. The plaintiff appealed and the Fourth Circuit, despite finding that the district court had erred in dismissing the section 1981 claims, held "the District Court's findings with respect to the Title VII claims collaterally estopped Lytle from litigating his § 1981 claims because the elements of a cause of action" under the two statutes were identical. 494 U.S. at 549, 110 S.Ct. 1331. The Supreme Court reversed, concluding that the right to a trial by jury outweighed any judicial economy concerns. *Id.* at 553–54, 110 S.Ct. 1331 ("Although our holding requires a new trial in this case, we view such litigation as essential to vindicating the [plaintiff's] Seventh Amendment rights.").

In this case there is no Seventh Amendment issue because Tomasello, as a federal employee, is not entitled to a jury trial on his ADEA claims. *See Cuddy v. Carmen,* 694 F.2d 853, 859 (D.C.Cir.1982) ("[A]lthough a person who brings an action against a private employer under ADEA does have the right to a jury trial, a federal employee or job applicant does not have that right."); *accord Lehman v. Nakshian,* 453 U.S. 156, 168–69, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) ("The conclusion is inescapable that Congress did not depart from its normal practice of not providing a right to trial by jury when it waived the sovereign immunity of the United States."). Accordingly, the Seventh Amendment presents no impediment to resolving the claim without remand. In addition we have previously held that the test for determining retaliation under the ADEA and Title VII is identical. *See Passer v. American Chem. Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991) (reciting Title VII retaliation test and stating "[t]here is no reason for us to apply a different test of retaliation in connection with claims under ADEA"). Nevertheless Tomasello argues that he is entitled to remand because "the evidence supporting retaliation under the ADEA would not be identical to the Title VII retaliation evidence." Reply Br. at 8. We do not agree. Here, assuming Tomasello is correct about the less than perfect fit between the Title VII and ADEA retaliation claims, he was not precluded from presenting evidence that would have demonstrated that retaliation motivated ATF's actions and, as noted above, the protected activity is the same with respect to the Title VII and ADEA claims. Accordingly, we affirm the district court's dismissal of Tomasello's Title VII and ADEA retaliation claims.[9]

## C. Title VII

Finally, Tomasello claims that he was entitled to compensatory damages and a jury trial on his pre-November 1991 Title VII claims. We believe that the Supreme Court's holding in *Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), that the compensatory damages and jury trial provisions of Title VII are not to be applied retroactively, forecloses his argument. Ignoring the reasoning of *Landgraf,* Tomasello argues that the principle enunciated in *Bradley v. School Board,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), that "a court is to apply the law in effect at the time it renders its decision" controls, and, because the 1991 amendments (authorizing compensatory damages and the right to a jury trial) were in effect at the time of trial, he is entitled to have his pre-November 1991 title VII claims heard by a jury and to seek compensatory damages. *Bradley,* however, did not "cast doubt on the traditional presumption *against* truly 'retrospective' application of a statute." *Landgraf,* 511 U.S. at 279, 114 S.Ct. 1483 (emphasis added).[10] Absent explicit congressional direction, which does not exist here, courts do not give effect to a newly enacted statute if the new statute "'impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed.'" *DIRECTV v. FCC,* 110 F.3d 816, 825–26 (D.C.Cir.1997) (quoting *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483) (alterations in original). Because application of the 1991 amendments here would "increase [Treasury's] liability for past conduct," *Landgraf,* 511 U.S. at 280, 114 S.Ct. 1483, the district court was correct in not allowing the jury to try the pre-November 1991 Title VII claims.

In so concluding, we reject Tomasello's contention that application of Title VII as amended would not be retroactive because he

---

9. We do not reach the ADEA sovereign immunity issue as we have disposed of the claims on other grounds. *See Washington,* 160 F.3d at 753. Nor do we decide if non-pecuniary damages are available under the Privacy Act as Tomasello failed to raise the issue below. *See Kattan,* 995 F.2d at 278.

10. As the Supreme Court noted in *Landgraf,* the grant of the jury trial right would ordinarily apply to a case pending at the time the statute granting the right is enacted. "However, because § 102(c) makes a jury trial available only 'if the complaining party seeks compensatory or punitive damages,' the jury must stand or fall with the attached damages provision." *Landgraf,* 511 U.S. at 281, 114 S.Ct. 1483.

alleged a "continuing violation," that is, the conduct giving rise to his claims that began before the statute's effective date continued beyond that date. The continuing violation exception recognized in *Thompson v. Sawyer,* 678 F.2d 257, 289 (D.C.Cir.1982), where we applied the 1972 amendments to Title VII to a "narrow class of cases—those in which the conduct for which the Government is liable began before but continued beyond the effective date of the statute," *Brown v. Secretary of the Army,* 78 F.3d 645, 652 (D.C.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 607, 136 L.Ed.2d 533 (1996), is not available because the 1991 amendments do not evince the same intent. In *Thompson,* we applied the amended statute not because the application was not retroactive but because we were following express congressional intent that " 'the 1972 amendments ... be applied to the fullest extent possible.' " *Brown,* 78 F.3d at 652 (quoting *McKenzie v. Sawyer,* 684 F.2d 62, 78 (D.C.Cir.1982)). As no similar intent undergirds the 1991 amendments, *see Landgraf,* 511 U.S. at 263, 114 S.Ct. 1483 ("[T]he 1991 Act conveys the impression that legislators agreed to disagree about whether and to what extent the Act would apply to preenactment conduct."), the *Thompson* holding buttresses rather than undercuts our conclusion—without evidence of congressional intent supporting retroactive application of the 1972 amendments, we would not have retroactively applied them. Accordingly, because the right to a jury trial is tied to the compensatory damages provision and because an award of compensatory damages for preenactment conduct would have an impermissible retroactive effect, *see supra* note 11, we affirm the district court's decision not to submit the preNovember 1991 claims to the jury.

Finally we reject Tomasello's remaining claims that the district court erred in granting judgment as a matter of law on the hostile work environment and constructive discharge claims and that the district court "committed legal error on the causation issue" regarding Tomasello's claims of retaliatory failure to promote. The district court dismissed the hostile work environment and constructive discharge claims, finding the alleged behavior insufficiently severe and pervasive as a matter of law, and ruled against Tomasello on the retaliatory failure to promote claim both due to the temporal remoteness of the protected activity from the allegedly retaliatory actions and because both Gagliardi and Hart were better qualified. Having thoroughly reviewed Tomasello's claims on these issues, we find them without merit.[11] Accordingly, we affirm the district court's dismissal of the hostile work environment and constructive discharge claims as well as its finding of no retaliation in relation to the failure to promote claims.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

---

**11.** On the retaliatory failure to promote claim, Tomasello challenges only the "temporal relationship" aspect of the district court's dismissal. He does not challenge the district court's finding that Gagliardi and Hart were better qualified. As the qualification ground standing alone provides an adequate basis for the district court's holding, we affirm and need not address the "temporal relationship" issue. On the hostile work environment and constructive discharge claims, Tomasello asserted that the claims were based on specific comments and on the Dyer, Lambert and McArdle memoranda. He did not request the district court to consider the alleged Privacy Act violations in deciding the hostile work environment claim and, accordingly, he may not raise the issue for the first time on appeal. *See Kattan,* 995 F.2d at 278. As this leaves only a series of nondiscriminatory memoranda and isolated comments, the last one of which occurred in 1990, we believe that the district court did not err in granting judgment as a matter of law on these claims. *Cf. Beckwith v. Career Blazers Learning Ctr.,* 946 F.Supp. 1035, 1051 (D.D.C.1996).