# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 14, 2006         Decided June 22, 2007

No. 05-7178

HIWOT NEMARIAM *ET AL.*,
APPELLANTS

v.

THE FEDERAL DEMOCRATIC REPUBLIC OF ETHIOPIA AND
THE COMMERCIAL BANK OF ETHIOPIA,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 00cv01392)

---

*Donald F. Donovan* argued the cause for the appellants. *Caroline H. Moustakis*, and *Colby A. Smith* were on brief. *Katherine B. Wilmore* entered an appearance.

*Knox Bemis* argued the cause for the appellees. *W. DeVier Pierson* and *Thomas R. Snider* were on brief.

Before: HENDERSON and TATEL, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellants—six individuals of Eritrean origin, descent or

nationality and the class they seek to represent—challenge the district court's dismissal of their unlawful takings claims against the Federal Democratic Republic of Ethiopia (Ethiopia) and the Central Bank of Ethiopia (CBE) for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA or Act), 28 U.S.C. §§ 1330, 1602-1611. The court held that the appellants' claims failed to satisfy both the "rights in property" and the "owned or operated" requirements of 28 U.S.C. § 1605(a)(3). As detailed below, we affirm the district court's dismissal on alternative grounds.

## I.

In May 1998, a long-standing border dispute between Eritrea and Ethiopia erupted into armed conflict. Approximately one month later, Ethiopia announced that a vast number of Eritreans living in the country "were engaged in spying and mobilizing financial and other resources to support the Eritrean aggression." First Amended Class Action Compl. ¶ 46 (Compl.), *reprinted in* Joint Appendix (JA) at 599 (internal quotation omitted). As a result, the appellants claim that they, along with thousands of other Eritreans, were expelled from the country "without notice or due process." *Id.* at 600.

In conjunction with their expulsions, the appellants claim that Ethiopia seized their bank accounts and other property. Specifically, they assert that Ethiopia issued an order freezing their CBE accounts "which prevented any access to or withdrawal of funds." *Id.* at 602-03. The CBE allegedly "retained the funds from these accounts or . . . exchanged them for other assets." *Id.* at 603. Although Ethiopia and the CBE contend that the funds in the accounts remain accessible, the appellants maintain that, having been expelled, they can never access the funds in their accounts because under Ethiopian banking law, holders of bank accounts must appear in person to withdraw funds—in Ethiopia there are no automated tellers,

wire transfers are not permitted and checking accounts are illegal.

The appellants also claim that their businesses, houses, automobiles and other property[1] were seized and in many cases sold substantially below their market value at auction "by CBE for the benefit of CBE and Ethiopia." Many of the sales allegedly occurred under the pretext that the property was burdened by a tax debt or that a mortgage was in default. Some sales proceeds may have been deposited into CBE bank accounts in the appellants' names. Corrected Mem. of P. & A. in Opp'n to Defs.' Refiled Mot. to Dismiss 16 (Corrected Mem.).

On December 12, 2000, Ethiopia and Eritrea signed a Peace Agreement (Agreement) providing for the permanent termination of military hostilities. One provision of the

---

[1]Appellant Sertzu Gebremeskel alleges that the CBE and Ethiopia seized and auctioned machinery and other immovable assets from his construction business. He also alleges that he lost his personal residence and household goods. Compl., *supra*, at JA 610-11.

Appellant Belay Redda alleges that the CBE and Ethiopia seized and auctioned his dry cleaning business. *Id.* at 605.

Appellant Tedros Asfaha alleges that "the Ethiopian Government" expropriated and sold his two shops. *Id.* at 613. He also alleges that he lost his household effects and two cars. *Id.*

Appellant Fekadu Andemeskal alleges that his businesses were confiscated. *Id.* at 615. He also alleges that he lost his family home, another house, cars, household possessions and "business imports waiting to clear customs." *Id.* at 615-16.

Appellant Mebrahtu Gebremedhin claims to have lost his house, a car and household goods. *Id.* at 619.

Appellant Hiwot Nemariam was married to appellant Belay Redda, who is deceased, and thus "shares in the losses suffered by her husband." *Id.* at 608.

Agreement created a Claims Commission (Commission) to adjudicate claims for loss, damage or injury related to the conflict and resulting from a violation of international law. Although the Agreement established the Commission as the exclusive forum for adjudicating claims arising from the conflict, it specifically provided for the continuance of claims filed in other fora before December 12, 2000.

The appellants brought suit in the district court on June 12, 2000. On August 12, 2001, the district court granted Ethiopia's and the CBE's motion to dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction on the basis of *forum non conveniens* in favor of the Commission. We overturned the dismissal, however, concluding that "the Commission's inability to make an award directly to [the appellants], and Eritrea's ability to set off [the appellants'] claim[s], against claims made by . . . Ethiopia, render the Commission an inadequate forum."[2] *Nemariam v. Fed. Democratic Republic of Ethiopia*, 315 F.3d 390, 395 (D.C. Cir. 2003).

Following our remand, jurisdictional discovery commenced in September 2003. Discovery disputes stalled its completion but the district court nevertheless directed Ethiopia and the CBE to file a renewed motion to dismiss. On the retirement of the district judge who originally dismissed the action, the judge to

---

[2]On December 12, 2001, Eritrea filed 32 claims with the Commission, including the claims at issue here. Three years later, on December 17, 2004, the Commission issued a "Partial Award" representing its final determination on liability regarding several of the claims. *See Partial Award, Civilians Claims, Eritrea's Claims 15, 16, 23 & 27-32*, Claims Commission ¶¶ 145-46, *reprinted in* JA at 1222-23). The award was "partial" in that it determined liability without calculating damages. The record does not indicate whether the Commission has since awarded damages.

whom it was assigned ordered the CBE and Ethiopia to refile memoranda in support of their renewed motion to dismiss and ordered the appellants to refile a response. In an Order dated November 8, 2005, the district court again dismissed the complaint for lack of subject matter jurisdiction. *Nemariam v. Fed. Democratic Republic of Ethiopia*, 400 F. Supp. 2d 76, 86 (D.D.C. 2005). This appeal followed.

## II.

FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). It gives the district court "jurisdiction over a civil action against a foreign sovereign for any claim 'with respect to which the foreign state is not entitled to immunity.'" *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005) (quoting 28 U.S.C. § 1330(a)[3]). A foreign state enjoys sovereign immunity under the Act "unless an international agreement or one of several exceptions in the statute provides otherwise." *Id.* (internal citations omitted). Thus, "[i]n the absence of an applicable exception, the foreign sovereign's immunity is 'complete'—'[t]he district court lacks subject matter jurisdiction over the plaintiff's case.'" *Id.* (quoting *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) (2d alteration in original)).

---

[3]Section 1330(a) provides:

The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of [title 28] or under any applicable international agreement.

28 U.S.C. § 1330(a).

The appellants seek to establish jurisdiction pursuant to 28 U.S.C. § 1605(a)(3)—FSIA's so-called "expropriation exception"—alleging that Ethiopia and the CBE illegally expropriated their bank accounts (bank account claims) and other property (non-bank account claims). Section 1605(a)(3) provides:

> **(a)** A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> > **(3)** in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). For the exception to apply, therefore, the court must find that: (1) "rights in property are at issue;" (2) "those rights were taken in violation of international law;" and (3) "a jurisdictional nexus [exists] between the expropriation and the United States." *Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 196, 197 (D.D.C. 2004), *aff'd*, 416 F.3d 83 (D.C. Cir. 2005). A jurisdictional nexus is established if: (a) the property "'is present in the United States in connection with a commercial activity carried on in the United States by the foreign state'" or (b) the property "'is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.'" *Id.* at 197-98 (quoting 28 U.S.C. § 1605(a)(3)). The appellants contend that both their bank account and non-bank

account claims satisfy the latter jurisdictional nexus requirement.

In their motion to dismiss, the CBE and Ethiopia did not dispute the appellants' factual allegations. *See* Defs.' Reply Mem. of Law in Supp. of Refiled Mot. to Dismiss for Lack of Jurisdiction 3 ("[G]rounds for dismissal are based upon issues of law, and *underlying facts sufficient to support dismissal are not in dispute*." (emphasis added)). Accordingly, we must "take the [appellants'] factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the [appellants]." *Phoenix Consulting*, 216 F.3d at 40. We review "*de novo* whether [the] facts are sufficient to divest the foreign sovereign of its immunity." *Price v. Socialist People's Libyan Arab Jamahiriya*, 389 F.3d 192, 197 (D.C. Cir. 2004).

### A. Bank Account Claims

The district court dismissed the appellants' bank account claims because they failed to satisfy both the "rights in property" and the "owned or operated" requirements of section 1605(a)(3). *See Nemariam*, 400 F. Supp. 2d at 83-84, 85. Specifically, the district court held that a bank account constitutes an intangible contract right to receive funds from the bank, *id.* at 83-84, the expropriation exception does not apply to intangible property, *id.* at 82, and the appellants failed to demonstrate that the CBE benefitted from its alleged control over the bank accounts, *id.* at 84-86.[4] Although we disagree with the district court's

---

[4]Relying on the holdings in *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation*, 730 F.2d 195 (5th Cir. 1984), and *Greenpeace, Inc. v. State of France*, 946 F. Supp. 773 (C.D. Cal. 1996), the district court concluded from FSIA's legislative history that the "owned or operated" language has a benefit element. *See infra* pp. 15-16; *Nemariam v. Fed. Democratic Republic of Ethiopia*, 400 F. Supp. 2d 76, 84-85 (D.D.C. 2005).

interpretation of the "rights in property" and the "owned or operated" requirements of section 1605(a)(3), we nevertheless agree with the district court that the CBE neither owns nor operates the appellants' bank accounts within the meaning of section 1605(a)(3).

## 1. "Rights In Property" Requirement

As an initial matter, the appellants' bank accounts constitute intangible property under Ethiopian banking law. Article 896 of the Ethiopian Commercial Code states, "The contract of deposit of funds *renders the bank owner of the funds deposited*, irrespective of the mode of deposit. The bank may dispose of these funds in respect of its professional activity, subject to their repayment under the conditions provided in the contract . . . ." Excerpt From Ethiopian Commercial Code of 1960, *reprinted in* JA at 1232 (emphasis added); *see also Hardee v. George H. Price Co.*, 89 F.2d 497, 499 (D.C. Cir. 1937) ("[I]t is the law that when *money* is deposited generally in a bank its ownership passes to the bank and the relation of debtor and creditor is at once created."). Thus, as the district court noted, "once funds are deposited into a holder['s] account, the holder simply has a contractual right to receive the funds upon request, not physical possession or even control of the actual funds." *Nemariam*, 400 F. Supp. 2d at 83; *see also Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995) (bank account "consists of nothing more or less than a promise to pay, from the bank to the depositor"). A contractual right to receive payment constitutes intangible property. *West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 830 (9th Cir. 1987) ("certificates of deposit may be characterized as intangible property or contracts"); *de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1395 (5th Cir. 1985) (contractual right to receive payment constitutes intangible property right).

We have yet to address whether the expropriation exception applies to intangible property. *See Peterson*, 416 F.3d at 88

("[W]e have not decided the question and need not do so today."). In fact, no circuit court has directly addressed the issue. *See, e.g.*, *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) ("We need not determine whether intangible contract rights are property under the statute . . . ."); *de Sanchez*, 770 F.2d at 1395 ("We need not decide here, however, whether Mrs. Sanchez's contractual right to receive payment on Banco Central's check is a 'right in property' within the meaning of Section 1605(a)(3).").[5] Some district courts—including our own—have held, based on the reasoning of a decision from the Southern District of New York, *see Canadian Overseas Ores Ltd. v. Compania de Acero Del Pacifico S.A.*, 528 F. Supp. 1337 (S.D.N.Y. 1982), *aff'd.*, 727 F.2d 274 (2d Cir. 1984), that the expropriation exception applies only to tangible property.[6]

---

[5]In *Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 101 (8th Cir. 1989), the Eighth Circuit affirmed the district court's denial of default judgment on a breach of contract claim brought against Iraq. It noted that "[s]ome courts have interpreted [section 1605(a)(3)] to exclude claims involving intangible property, such as contracts." The court further explained, however, that the contract rights at issue "were not expropriated—rather, the contract itself was repudiated by defendants. We find that such a repudiation is not equivalent to expropriation." *Id.* (citing *Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 616 F. Supp. 660, 663 n.5 (W.D. Mich. 1985)). In distinguishing between expropriation and repudiation, the court suggested that a different result might have been reached had the contract rights been expropriated.

[6]*See Gutch v. Fed. Republic of Germany*, 444 F. Supp. 2d 1, 10 (D.D.C. 2006); *Yang Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 101 (D.D.C. 2005); *Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 197 (D.D.C. 2004), *aff'd*, 416 F.3d 83 (D.C. Cir. 2005); *see also Daventree Ltd. v. Republic of Azerbaijan*,

In *Canadian Overseas*, the district court dismissed a claim brought under section 1605(a)(3) of FSIA seeking payment "for spare parts and related equipment allegedly delivered" to a company acquired by the defendant and "to recover for loans allegedly made" to that company by its predecessor. *Id.* at 1338. Focusing on FSIA's legislative history, the court concluded that the claim did not involve "rights in property." It relied on the Foreign Sovereign Immunities Act of 1976 House Report (House Report), which stated that the expropriation exception was "in no way [to] affect[] existing law on the extent to which, if at all, the 'act of state' doctrine may be applicable."[7] H.R. Rep. No. 94-1487, at 20 (1976). The House Report cited—without further explanation—22 U.S.C. § 2370(e)(2). That statute—known as the Hickenlooper Amendment—provides:

> Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to

349 F. Supp. 2d 736, 751 (S.D.N.Y. 2004); *Lord Day & Lord v. Socialist Republic of Vietnam*, 134 F. Supp. 2d 549, 560 (S.D.N.Y. 2001); *Sampson v. Fed. Republic of Germany*, 975 F. Supp. 1108, 1117 (N.D. Ill. 1997); *Intercontinental Dictionary Series v. de Gruyter*, 822 F. Supp. 662, 678 (C.D. Cal. 1993).

[7]The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). The doctrine is "derived from a policy of mutual respect for other nations' sovereignty and the appropriate roles of the judicial and executive branches of government." *Daventree*, 349 F. Supp. 2d at 754 (citing *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897)).

property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law . . . .

22 U.S.C. § 2370(e)(2).[8]  The district court in *Canadian Overseas* reasoned that, because the "claim of title or other right to property" language in the Hickenlooper Amendment "has been interpreted to apply only to takings of tangible property [and] not to include intangible interests like [a] contractual right to payment," it had to interpret the similar language in section 1605(a)(3) as applying only to tangible property.[9] *Canadian Overseas*, 528 F. Supp. at 1346.  Otherwise, "[w]ere the phrase 'rights in property taken in violation of international law' in the FSIA interpreted more broadly than the similar phrase utilized in the Hickenlooper Amendment, Congress would have conferred jurisdiction for suits only to have them dismissed in accordance with the act of state doctrine." *Id.*  The court also

---

[8]Through the Hickenlooper Amendment,

Congress . . . adopted a specific statutory provision requiring federal courts to examine the merits of controversies involving expropriation claims. [It] overrides the judicially developed doctrine of act of state.  Hickenlooper was passed in response to the Supreme Court's decision in [*Sabbatino*, 376 U.S. 398], which barred adjudication of an expropriation claim on act of state grounds.

*West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 829 (9th Cir. 1987).

[9]The Court of Appeals of New York first interpreted the Hickenlooper Amendment as applying to tangible property only. *See French v. Banco Nacional de Cuba*, 23 N.Y.2d 46 (1968).  The Second Circuit adopted that interpretation in *Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir. 1973).

noted that "the further requirements in § 1605(a)(3) that 'the property taken in violation of international law' or 'any property exchanged therefor' be 'present in the United States in connection with a commercial activity carried on in the United States by a foreign state' or be 'owned or operated by an agency or instrumentality of the foreign state . . . engaged in commercial activity in the United States'" suggested that section 1605(a)(3) is "applicable to tangible property [and] is on its face inapplicable to a contractual right to be paid." *Id.* (ellipsis in original).[10]

The appellants contend that *Canadian Overseas* is "inapposite" because it "involved unvested rights of a fundamentally different nature than bank accounts." Appellants' Br. at 20. They maintain that two other district court decisions—*Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia*, 616 F. Supp. 660 (W.D. Mich. 1985) and *de Sanchez v. Banco Central de Nicaragua*, 515 F. Supp. 900, 910 (E.D. La. 1981), *aff'd on other grounds*, 770 F.2d 1385 (5th Cir. 1985)—support their claim that section 1605(a)(3) applies to intangible property,

---

[10]The Southern District of New York subsequently had second thoughts. In *Zappia Middle East Construction Co. v. Emirate of Abu Dhabi*, No. 94 CIV.1942, 1996 WL 413680 (S.D.N.Y. July 24, 1996), it appeared to doubt the tangible/intangible distinction, *id.* at *8 n.8. It noted that in *Banco Nacional de Cuba*, 822 F.2d 230 (2d Cir. 1987), the Second Circuit declared that "[a]s defined in international law, property commonly includes intangible assets and 'any interest in property if such interest has a reasonably ascertainable value.'" *Zappia*, 1996 WL 413680, at *8 n.8 (quoting *Banco Nacional de Cuba*, 822 F.2d at 238) (alteration in original). Although the Second Circuit was not interpreting FSIA in *Banco Nacional de Cuba*, the *Zappia* court noted that "[i]t appears anomalous that taking of intangible property constitutes a violation of international law, but lies outside of the expropriation exception of FSIA." *Id.*

including their accounts. Appellants' Br. at 15-16. In *Kalamazoo*, the district court held that the seizure of the controlling stockholder's interest in a corporation triggered the expropriation exception. 616 F. Supp. at 663. The *Kalamazoo* court, however, did not characterize the property right as intangible property. *See id.* ("The rights in property that are at issue are the *assets* of [the corporation]." (emphasis added)). Rather, it determined that a controlling interest in the corporation's stock was no different from the corporation's physical assets under section 1605(a)(3) because "[i]n either case, the foreign state has expropriated control of the assets and profits of the corporation." *Id.*[11] Unlike a controlling interest in corporate stock, however, a bank account does not represent control of a tangible asset—instead it constitutes a contractual right to receive payment from funds owned by the bank. *See Hardee*, 89 F.2d at 499.[12]

Despite the popularity of the *Canadian Overseas* decision in the district courts, *see, e.g.*, *Peterson*, 332 F. Supp. 2d at 197, we find its reasoning unpersuasive. Neither the plain language of

---

[11]In fact, the *Kalamazoo* court distinguished *Canadian Overseas*, declaring, "[*Canadian Overseas*] is not to the contrary. That case did not involve an expropriation but the simple repudiation of a contractual obligation. In this case, no one disputes that the [foreign sovereign] expropriated some kind of property, whether stock or assets." *Kalamazoo*, 616 F. Supp. at 663 n.5 (internal citations omitted).

[12]In the other district court decision relied on by the appellants, *de Sanchez*, the district court applied the expropriation exception to a certificate of deposit without discussing the tangible/intangible property distinction. 515 F. Supp. 900, 910 (E.D. La. 1981), *aff'd on other grounds*, 770 F.2d 1385 (5th Cir. 1985). The *de Sanchez* decision predated *Canadian Overseas* and included no explanation of the applicability of section 1605(a)(3) to a certificate of deposit. *See id.*

section 1605(a)(3) nor its legislative history expressly states that the expropriation exception applies only to tangible property. Moreover, "the tangible/intangible characterization of property interests . . . is a distinction without a difference" and "is not generally recognized in international, federal, or state law." *West*, 807 F.2d at 830 ("'The relationship between a depositor and bank arises only out of contract[,] . . . a contract right is property.'" (quoting *Panel Opinion No. 1, (revised)*, Fourteenth Semiannual Report to the Congress for the Period Ending June 30, 1961, 124, 125 (Foreign Claims Settlement Comm'n) (alterations in original) (alteration omitted))); *see also Banco Nacional de Cuba v. Chem. Bank N.Y. Trust Co.*, 822 F.2d 230, 238 (2d Cir. 1987). The *Canadian Overseas* court's conclusions rest instead on (1) section 1605(a)(3)'s link to the Hickenlooper Amendment and (2) the Hickenlooper Amendment's applicability to tangible property only. We believe the first conclusion is erroneous and we therefore do not opine on the Hickenlooper Amendment's reach.

At least two obstacles prevent a federal court from adjudicating on the merits a claim against a foreign sovereign: foreign sovereign immunity and the act of state doctrine. Section 1605(a)(3) and the Hickenlooper Amendment operate to remove these obstacles for a claim involving the expropriation of "property" in violation of international law. That is, section 1605(a)(3) provides subject matter jurisdiction by creating an exception to foreign sovereign immunity for a claim involving the expropriation of "rights in property." 28 U.S.C. § 1605(a)(3). And the Hickenlooper Amendment creates an exception to the act of state doctrine for a claim involving the expropriation of a "claim of title or other right to property." 22 U.S.C. § 2370(e)(2).

The *Canadian Overseas* court reasoned that because both the expropriation exception and the Hickenlooper Amendment serve a similar purpose, the statutes must be interpreted consistently.

Neither the text nor the legislative history of section 1605(a)(3), however, supports such a reading. In fact, the House Report relied on in *Canadian Overseas* suggests that the statutes were not to operate in tandem. It declared that section 1605(a)(3) "deals *solely* with issues of *immunity*" and that "it in *no way affects* existing law on the extent to which, if at all, the 'act of state doctrine' may be applicable." H.R. Rep. No. 94-1487, at 20 (emphases added). In other words, the House Report indicates that the Congress intended that the expropriation exception to foreign sovereign immunity operate independently from the Hickenlooper Amendment's exception to the act of state doctrine. In a footnote following a citation to the Hickenlooper Amendment, the House Report further explained:

> The committee has been advised that in some cases, *after the defense of sovereign immunity has been denied or removed as an issue*, the act of state doctrine may be improperly asserted in an effort to block litigation. . . . The committee has found it *unnecessary to address the act of state doctrine in this legislation* since decisions such as that in [*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976)] demonstrate that our courts already have considerable guidance enabling them to reject improper assertions of the act of state doctrine.

*Id.* at 20 n.10 (emphases added). Thus, instead of limiting the expropriation exception to tangible property, the Congress expressed confidence that federal courts would not apply the act of state doctrine too broadly—that is, to "improperl[y]" *prevent* adjudication on the merits *after* jurisdiction had been established.

We are therefore free to interpret section 1605(a)(3) independent of the Hickenlooper Amendment—and more important, we believe this interpretation to be the correct one. The plain language of section 1605(a)(3)—as well as its

legislative history—does not limit its application to tangible property. Moreover, there seems to us to be no reason to distinguish between tangible and intangible property when the operative phrase is "rights in property." We therefore conclude that the expropriation exception applies to the appellants' bank accounts. We next consider whether the CBE "own[s] or operate[s]" those accounts.

### 2. "Owned or Operated" Requirement

The district court concluded that the "owned or operated" language of section 1605(a)(3) requires a showing that the property benefitted the government which allegedly expropriated it. *Nemariam*, 400 F. Supp. 2d at 84-85. In so holding, it relied on the only two reported decisions addressing the issue—*Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne de Navigation*, 730 F.2d 195 (5th Cir. 1984), and *Greenpeace, Inc. v. State of France*, 946 F. Supp. 773 (C.D. Cal. 1996). Unlike the district court, we are not persuaded by the reasoning of those decisions.

In *Vencedora*, the Fifth Circuit dismissed a claim that an Algerian corporation had tortiously deprived the appellant of its wrecked oil tanker following a salvage operation. 730 F.2d at 196, 197. The court held that the expropriation exception did not apply because "owned or operated" means more than "'possess[ed]' or 'controll[ed].'" *Id.* at 204. Citing FSIA's House Report, the court explained:

> [S]ection 1605(a)(3) was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state. The vessel in this case thus would have been owned or operated under section 1605(a)(3) if . . . some Algerian agency had

> assumed control of the vessel and had used it to carry oil for the benefit of the Algerian government.

*Id.* (internal citation omitted). The *Greenpeace* district court adopted the Fifth Circuit's reasoning. It held that a vessel allegedly "impounded, inventoried and sealed," 946 F. Supp. at 777, by the French Navy was not "owned or operated" by France because neither "France [n]or some French agency had assumed control of the vessel and had used it for the benefit of the French government," *id.* at 784.

We believe the *Vencedora* holding runs contrary to the language and legislative history of section 1605(a)(3). The phrase "owned or operated" plainly does not include a benefit requirement. To "own" is to "have or hold as property or appurtenance . . . [possess],"[13] *see* Webster's Third International Dictionary 1612 (3d ed. 1993), and to "operate" is to "exert power or influence," *id.* at 1580. Moreover, the legislative history the Fifth Circuit cited, H.R. Rep. No. 94-1487, at 19-20, did not impose such a requirement or even refer to the "owned or operated" language. Rather, the House Report defined the phrase "taken in violation of international law," stating, "The term 'taken in violation of international law' would include the nationalization or expropriation of property without payment of the prompt[,] adequate and effective compensation required by international law." H.R. Rep. No. 94-1487, at 19-20. Even assuming the Report addressed the "owned or operated" language, the plain meaning of "nationalization or expropriation" dovetails with the plain meaning of "owned or operated" and thus weighs against imposing a benefit requirement. That is, to "expropriate" is to "transfer (the property of another) to one's own possession," Webster's, *supra*, at 803, and to "nationalize" is to "invest in the central

---

[13]To "possess" is to "seize or gain control of." Webster's Third New International Dictionary 1770 (3d ed. 1993).

government of a nation the control or ownership of" property, *id.* at 1505. "Where . . . the plain language of the statute is clear, the court generally will not inquire further into its meaning, at least in the absence of a clearly expressed legislative intent to the contrary." *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995) (internal quotation and citations omitted). Accordingly, we decline to add a benefit element to the "owned or operated" requirement and conclude instead that the phrase "owned or operated" means "possessed or exerted control or influence over" the property at issue.

We nonetheless agree with the district court's dismissal of the bank account claims for a different reason. *Cf. Wilburn v. Robinson*, 480 F.3d 1140, 1148 (D.C. Cir. 2007) ("We can . . . affirm a grant of summary judgment on alternative grounds, if applicable." (citing *Wash.-Balt. Newspaper Guild, Local 35 v. Wash. Post*, 959 F.2d 288, 292 n.3 (D.C. Cir. 1992))). The appellants have failed to demonstrate that the CBE "owned or operated" their bank accounts. As explained *supra*, the CBE owns the funds in the appellants' accounts. *Hardee*, 89 F.2d at 499. The *property right* at issue, however, is the appellants' *contractual right to receive payment* and the CBE has neither taken possession of nor exerted control over that right. Instead, accepting as true the appellants' allegation that Ethiopia and the CBE have in fact prevented them from accessing the funds in the accounts, *see Nemariam*, 400 F. Supp. 2d at 85, we believe the CBE has *extinguished* that contract right. *See Strumpf*, 516 U.S. at 21 (noting, in bankruptcy context, "[bank's] refusal to pay [depositor] was neither a taking of possession of [depositor's] property *nor an exercising of control over it*, but merely a refusal to perform its promise." (emphasis added)); *cf. Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 101 (8th Cir. 1989) ("[P]laintiffs' contract rights were not expropriated—rather, the contract itself was repudiated by defendants. We find that such a repudiation is not equivalent to expropriation." (citation omitted)); *Kalamazoo*, 616 F. Supp. at

663 n.5 ("[*Canadian Overseas*] did not involve an expropriation but the simple repudiation of a contractual obligation."); *Canadian Overseas*, 528 F. Supp. at 1346-47 ("Neither [the defendant] nor any other party claims ownership of the right to be paid under the contracts which [the plaintiff] asserts."). That is, the CBE did not assume the appellants' contractual right to performance—instead it declined to perform its own contractual obligations.

Because the appellants have failed to satisfy the "owned or operated" requirement of section 1605(a)(3) with respect to their bank account claims, Ethiopia and the CBE are immune from suit on those claims. *See* 28 U.S.C. § 1330. Accordingly, we affirm the district court's dismissal of the claims under Federal Rule of Civil Procedure 12(b)(1).

## B. Non-Bank Account Claims

In a footnote, the district court also dismissed the appellants' non-bank account claims. Following its conclusion that the appellants' "intangible" bank accounts do not constitute "rights in property," the district court declared:

> The papers submitted by both parties focus solely on the bank accounts as the property that has allegedly been taken and remains in that status. Despite allegations in the complaint that the plaintiffs' real property, *i.e.,* their homes and businesses, were also illegally taken, there is no discussion of whether these tangible properties provide[] the basis for FSIA jurisdiction. Presumably these properties have not been discussed by the plaintiffs because they have been sold, and the proceeds from the sales have been placed in the plaintiffs' bank accounts, thereby making the taking of the bank accounts as [sic] the only property that would form the basis for this Court to have FSIA jurisdiction.

*Nemariam*, 400 F. Supp. 2d at 84 n.4. In other words, the district court dismissed the appellants' non-bank account claims because it "presumed"—based on the appellants' opposition to the motion to dismiss—that the bank account claims encompassed all property allegedly expropriated.

The appellants argue on appeal that the district court had "no basis" to so presume. Appellants' Br. at 43. They maintain that they raised their non-bank account claims both in their complaint[14] and in the "Statement of the Case" section of their opposition to the motion to dismiss.[15] Moreover, they contend that Ethiopia and the CBE failed to allege that "all of [the] non-bank-account property had been sold" and that "there was no support in [their] allegations or in the evidence presented for such a conclusion." *Id.* Finally, they argue that the appellees' taking of their non-bank account property satisfies the "owned or operated" requirement of section 1605(a)(3).

As the district court noted, *Nemariam*, 400 F. Supp. 2d at 84 n.4, the appellants failed to expressly argue that the non-bank account property establishes an independent basis for FSIA jurisdiction. In their motion to dismiss, Ethiopia and the CBE plainly sought dismissal of *all* of the appellants' claims, arguing, *inter alia*, that section 1605(a)(3) does not apply to intangible property, *see* Defs.' Mem. of Law in Supp. of Refiled Mot. to Dismiss for Lack of Jurisdiction 12 ("The Expropriation Exception of the FSIA Does Not Apply, and Therefore This Court Lacks Subject Matter Jurisdiction."), 16, and suggesting that the proceeds from the sales of the non-bank account property were deposited into the appellants' bank accounts, *id.*

---

[14]*See supra* note 1.

[15]They asserted: "Ethiopia and CBE subsequently foreclosed upon, or otherwise seized and auctioned off, deportees' homes, businesses, and other property." Corrected Mem., *supra*, at 8.

at 11 ("The Commission ruled that it was lawful for Ethiopia to deposit the proceeds of deportees' property sales in their CBE accounts even where those accounts were restricted in a way that effectively foreclosed fund transfers abroad." (citing *Partial Award, Civilians Claims, Eritrea's Claims 15, 16, 23 & 27-32*, Claims Commission ¶ 146, *reprinted in* JA at 1222)). Indeed, the motion to dismiss recited, "The only property at issue is Plaintiffs' CBE accounts." *Id.* at 21. In their opposition, the appellants did not challenge the assertion that the bank accounts were the only property at issue. Although they disputed that section 1605(a)(3) applies only to tangible property, *see* Corrected Mem., *supra*, at 21, they failed to argue in the alternative that tangible, non-bank account property had also been expropriated. Moreover, the appellants noted that Ethiopia and the CBE did not deny "that their bank accounts, *including proceeds from involuntary sales of other property*, have remained with CBE." *Id.* at 16 (emphasis added). They subsequently failed to challenge the district court's "presumption" noted in its dismissal order that the bank account claims encompassed all property allegedly expropriated. Instead of moving the district court to reconsider, *see* Fed. R. Civ. P. 59(e), the appellants raised the issue for the first time on appeal. Nonetheless, "'[a]bsent exceptional circumstances, the court of appeals is not a forum in which a litigant can present legal theories that it neglected to raise in a timely manner in proceedings below.'" *Grant v. U.S. Air Force*, 197 F.3d 539, 542 (D.C. Cir. 1999) (quoting *Tomasello v. Rubin*, 167 F.3d 612, 618 n.6 (D.C. Cir. 1999)). "Exceptional circumstances" include "cases involving uncertainty in the law; novel, important, and recurring questions of federal law; intervening change in the law; and extraordinary situations with the potential for miscarriages of justice." *Flynn v. Comm'r*, 269 F.3d 1064, 1069 (D.C. Cir. 2001). The appellants have offered no explanation for their failure to pursue their non-bank account claims in the

district court.  Accordingly, we decline to address their non-bank account claims.

For the foregoing reasons, we affirm the district court's dismissal of the complaint for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

*So ordered.*